Filed 4/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CANDACE CONTI,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>WATCHTOWER BIBLE & TRACT SOCIETY OF NEW YORK, INC. et al.,<br><br>　　　Defendants and Appellants. | A136641<br><br>(Alameda County<br>Super. Ct. No. HG11558324) |

　　　In this case we consider the duty owed by a religious organization to one of its members who has been harmed by another member. Candace Conti, formerly a member of the North Fremont Congregation of Jehovah's Witnesses (Fremont Congregation or Congregation) sued the Congregation and Watchtower Bible and Tract Society of New York, Inc. (Watchtower), the Jehovah's Witnesses's headquarters at the time, for damages for her sexual abuse as a child by Jonathan Kendrick (Kendrick), another member of the Congregation. Before Conti was molested, the Congregation and Watchtower (hereafter collectively defendants) elders and officials learned that Kendrick had molested another child. Conti sought to hold defendants liable for failing to warn the Congregation or her parents that Kendrick was a child molester, and for failing to limit and supervise his participation in church activities. A jury found defendants liable for compensatory damages to Conti, and held Watchtower liable for punitive damages.

　　　We hold that defendants had no duty to warn the Congregation or Conti's parents that Kendrick had molested a child, but that defendants *can* be held liable for failing to limit and supervise Kendrick's "field service," a church-sponsored activity where members go door-to-door preaching in the community. Kendrick had unsupervised

1

access to Conti during field service that he used as opportunities to molest her. Because breach of the alleged duty to warn was the sole basis for imposition of punitive damages on Watchtower, we reverse that portion of the judgment, with directions to enter judgment for Watchtower on the punitive damage claim. The compensatory damage award is affirmed.

## I. BACKGROUND

The Jehovah's Witnesses is a religion with about 1.2 million members in 13,400 congregations in the United States. In the 1990's, Watchtower was in charge of the church's policies. Congregations are comprised of elders, ministerial servants, and rank-and-file members called "baptized publishers." All members in good standing are considered "ministers." Elders are the spiritual leaders of their congregations, comparable to clergy in other religions. Ministerial servants do administrative work such as distributing literature to members, and handling microphones at meetings. Watchtower admitted that Fremont Congregation elders Gary Abrahamson and Michael Clarke were Watchtower's agents while acting within the course and scope of their church duties. In addition to Sunday and midweek meetings, Congregation activities include field service, where small groups, usually consisting of two or three people, go door-to-door in neighborhoods to spread the church's spiritual teachings.

Congregations are small and close knit. The average congregation has 75 to 150 members. At different times, the Fremont Congregation had from 100 to 140 members, of whom 6 to 13 were elders. Evelyn Kendrick (Evelyn), who was married to Kendrick during the period when he molested Conti, testified that "we only socialized with people of that congregation. We were kind of—well, not told outright, but that we should only associate with people of that religion and not of any other religion because they could be a bad influence." Congregation members call each other "brother" and "sister."

Conti and Kendrick were Fremont Congregation members in the 1990's, and for a time Kendrick was a ministerial servant. Conti testified that Kendrick began molesting her around the time she turned nine years old in late 1994, and continued until 1996 or

2

1997, when she was age 10 or 11. Before Kendrick molested Conti, the Congregation elders learned that he had molested his stepdaughter.

In November 1993, elder Clarke received a call from Evelyn or Kendrick asking for a consultation about Kendrick's abuse of Evelyn's daughter. Clarke and Abrahamson went to their home that week and spoke with Kendrick, Evelyn, and her daughter. The elders were told that, four months earlier, Kendrick had touched his stepdaughter's breast around the time of her 14th birthday. The stepdaughter told Evelyn about the molestation minutes after it occurred, but Evelyn testified that she did not immediately report it because she thought it was an isolated incident and she was "trying to deal with it" within the family. The details of what the elders were told about the incident were disputed at trial. Among other things, Evelyn disputed the elders' testimony that she told them to keep the incident private, and that Kendrick said he touched her daughter "inadvertently." Even so, the elders did not believe the touching was accidental.

The elders told Evelyn and her daughter that they were free to report the incident to the police. Abrahamson testified that they neither encouraged nor discouraged Evelyn and her daughter from doing so; "[i]t was up to them." Evelyn reported the incident to the police in February 1994. Kendrick admitted touching his stepdaughter's breast, and was convicted of a misdemeanor. Elders at the Congregation did not learn of Evelyn's report to the police until a couple of years later.

After meeting with the Kendrick family, Clarke wrote a letter to Watchtower to report "a case of child abuse" by Kendrick. Abrahamson testified that the Congregation was required to contact Watchtower for instructions in such a situation.[1] The copy of the

---

[1] "Q. Why were you reporting this to Watchtower New York? [¶] A. To get direction. [¶] Q. And in all of your work as an elder that involves anything in this type of matter, you would get your direction and instruction from New York. Correct? [¶] A. In a lot of these cases that legal matters are involved, we are always encouraged to call the Legal Department because how could we know all the laws. And the laws change from state to state, but our Legal department could help us through this. [¶] Q. And you used the word 'encouraged' but actually you are required to call New York? [¶] A. You might put it that way. Yes. [¶] Q. I did put it that way. Do you agree? [¶] A. I agree you put it that way. [¶] Q. Do you agree that you were required to call New York? [¶] A. Yes."

letter in evidence is heavily redacted. In the unredacted portion, the letter stated that the Congregation had phoned Watchtower about the Kendrick matter, the "legal department had given us some direction," and Watchtower had asked the Congregation to submit its questions in writing. The letter said the elders planned to tell the Congregation that Kendrick would no longer be acting as a ministerial servant, and asked Watchtower to advise if that was an "incorrect" course of action. Clarke testified that Watchtower responded to his letter, but he did not provide the substance of the response and no written response is in evidence. The testimony was simply: "Q. And Watchtower did respond to the letter and he was removed as a ministerial servant? [¶] A. Correct. And we announced that."

Allen Shuster, a Watchtower official in New York, testified that Watchtower policy allowed a known child molester to continue to perform field service, but not alone or with a child. Defense expert Monica Applewhite, whose testimony is discussed further below, said that Watchtower policies were implemented by letters sent "to all bodies of elders in the United States." However, Shuster was unable to identify any church-wide writing that documented the limitations on field service by known child molesters. He said this policy was implemented by letters to elders on a case-by-case basis.[2]

Abrahamson testified that he told the Fremont Congregation elders what he learned at the Kendrick family meeting, and they agreed that Kendrick was no longer fit

---

[2] When Shuster was asked whether a person known to be a child molester "can be sent out as a baptized publisher into neighborhoods to spread the word of the gospel?" the following testimony ensued: "A. Yes. But not by themselves or with a child. [¶] Q. "Is there in writing anywhere the caveat that you just gave to us? I haven't seen it in any of the exhibits. [¶] A. I believe we have something in writing, yes. I couldn't put my finger on it right now, but yes. [¶] Q. Is it here with us today? [¶] A. I don't know if it is here. I don't recall. [¶] . . . [¶] "Any reason why, if there was a policy that specifically prohibited baptized publishers who were known to have molested children from going into field service with a child, that that written policy wouldn't be right in front of you right now? [¶] A. That policy is specific to each individual situation. In each situation there are instructions given in the letter to a body of elders where that individual is and that instruction is given in that letter."

to serve as a ministerial servant. They removed Kendrick from the position, and announced his removal to the Congregation without disclosing the reason for it.

Clarke testified that the Fremont Congregation elders were following Watchtower policy in keeping information about the molestation confidential. That policy was set forth in a July 1, 1989 letter from Watchtower to all elders in the United States, and it was a centerpiece of Conti's case against Watchtower.

The letter addressed the elders' "duties that may involve legal issues or questions." Watchtower instructed the elders they "must be careful not to divulge information about personal matters to unauthorized persons. . . . Elders must give special heed to the counsel: 'Do not reveal the confidential talk of another.' (Proverbs 25:9) . . . Improper use of the tongue by an elder can result in serious legal problems for the individual, the congregation, and even the Society. [¶] . . . Worldly persons are quick to resort to lawsuits if they feel their 'rights' have been violated. Some who oppose the Kingdom preaching work readily take advantage of any legal provisions to interfere with it or impede its progress. Thus, elders must especially guard the use of the tongue."

The letter continued: "The spirit of the world has sensitized people regarding their legal 'rights' and the legal means by which they can exact punishment if such 'rights' are violated. Hence, a growing number of vindictive or disgruntled ones, as well as opposers, have initiated lawsuits to inflict financial penalties on the individual, the congregation, or the Society. Many of these lawsuits are the result of the misuse of the tongue. . . . [¶] . . . [¶] The legal consequences of a breach of confidentiality by the elders can be substantial. If the elders fail to follow the Society's direction carefully in handling confidential matters, such mistakes could result in successful litigation by those offended. Substantial monetary damages could be assessed against the elders or congregation."

The letter went on to discuss "what to do in specific cases," such as "[s]earch warrants and [s]ubpoenas," "[c]rimes and [c]riminal investigations," "[w]hen [l]awsuits are [t]hreatened," and "[c]hild [c]ustody." On the subject of "[c]hild [a]buse," the letter stated: "Many states have child abuse reporting laws. When elders receive reports of physical or sexual abuse of a child, they should contact the Society's Legal Department

5

immediately. Victims of such abuse need to be protected from further danger." The letter concluded with "points to remember," such as "[b]e extremely careful with written material," and "[a]ppreciate the [i]mportance of [m]aintaining [c]onfidentiality." With respect to confidentiality, the letter stated: "Elders must exercise extraordinary caution when it comes to handling confidential information about the private lives of others. Do not mistakenly minimize the gravity of a breach of confidentiality. Unauthorized disclosure of confidential information can result in costly lawsuits. Even if a lawsuit turns out favorably, valuable time and energy that could have been devoted to Kingdom interests will be lost."

Clarke testified that the policy stated in the letter was intended to protect confidential ministerial communications as well as to avoid legal liability. He thought that "confidentiality is important for a minister." He asked, "Why would anybody come to us with their problems if they knew that as soon as they come to us we were going to announce it? Why would anybody confess to a Catholic priest if they knew that after they confessed it was going to be announced at mass next week. It is ludicrous. [¶] So [the policy was] put in place so that the friends would feel comfortable coming to us and we could keep confidence."

Clarke testified that the elders told Kendrick he could not "show affection to children, put children on his lap, work with them out in the door-to-door ministry, work with children in the Kingdom Hall. [¶] And we made it clear to him that we were going to be watching him. And we did, all, the whole body of elders." Elder Lawrence Lamerdin said the Congregation had 10 to 13 elders at the time and they "made sure that [Kendrick] was watched." Abrahamson saw "no need" to inform the Congregation that Kendrick had molested a child because the elders would have warned the parents of any child they saw Kendrick getting close to or isolating.

In an August 1, 1995 policy letter to United States elders on the subject of child abuse, Watchtower stated: "[S]teps should be taken to protect the child, or other children, from further sexual abuse. Obviously, parents would be keenly interested in taking adequate precautions in this regard. . . . Loving elders, too, will want to act in a way that

6

demonstrates their protective care, since the word 'overseer' carries the thought of one who watches over, a guardian, a shepherd of the flock. . . . [¶] It would be appropriate to talk very frankly to a former child abuser, strongly cautioning him as to the dangers of hugging or holding children on his lap and that he should never be in the presence of a child without another adult being present."

There was testimony that Jehovah's Witnesses conduct no activities such as classes or trips that by their nature separate children from their parents, and Clarke testified that parents in the congregations are regarded as "the first line of defense" in preventing child sexual abuse. Parents were educated about child sexual abuse in *Awake!*, a publication distributed to all congregation members. Child abuse was discussed at length in the January 22, 1985 issue, which covered topics such as "Who Would Do a Thing Like That?" and "You Can Protect Your Child." The subject was also the focus of the October 8, 1993 issue, which addressed the question "How Can We Protect [Our Children]?" The discussion under that heading stated: "Tragically, adult society often unwittingly collaborates with child abusers. How so? By refusing to be aware of this danger, by fostering a hush-hush attitude about it, by believing oft-repeated myths. Ignorance, misinformation, and silence give safe haven to abusers, not their victims." Both issues addressed misconceptions about child sexual abuse, including the belief that such abuse is most commonly perpetrated by strangers to the victims, and the 1985 issue gave as an example a girl who was molested by "a man who was running a church group."

Conti testified that she met Kendrick at the Fremont Congregation's Kingdom Hall, a building for Congregation meetings that seats 220 people. She said that Kendrick insinuated himself into her family, befriended her father Neal at meetings, and then began coming to their house. He molested her several times a month for a couple of years. With one exception, the incidents occurred at Kendrick's home, where he drove Conti after meetings and during field service. On one occasion, Kendrick put his hand up her shirt while they were riding on a train with her father.

7

Kendrick began getting physical with her by repeatedly hugging her at Kingdom Hall. She always went to Kingdom Hall with at least one parent, but Kendrick made her sit on his lap during meetings. She sometimes went to field service without her parents, and Kendrick sometimes drove her to the group meetings that preceded the door-to door field service, where partners for the activity were assigned. They did field service together many times without either of Conti's parents present. Conti said that the molestations occurred while they were supposed to be performing field service: "Our groups would go out, we would get our territories, and we would go out and service. And we would do door to door. [¶] And then there were times when our groups would separate even further. And we would go to . . . laundry mats . . . and things like that. And sometimes he would take me . . . to go do some of these things and then we would end up at his house." Kendrick drove her to his house, and when he finished molesting her, they would go "[m]aybe to the Kingdom Hall. Maybe to lunch with the rest of the service group."

Conti's father Neal testified that he did not see Kendrick engage in any of the inappropriate behavior described by Conti. Neal said he was always with Conti at meetings and during field service, he did not allow Conti to leave meetings with Kendrick, and did not see Kendrick hug Conti or Conti sit on Kendrick's lap. Conti's mother Kathleen testified that she had mental health problems during the two years before she and Neal separated in July 1996, which prevented her from caring for Conti. As a result, Conti was often on her own during that time. Kendrick was always offering to help Conti and take her places, and Kathleen thought he was just being nice.

Clinical social worker Laura Fraser counseled Conti and her parents from August 1996 to April 1998. Fraser testified that Neal and Kathleen were going through a tumultuous divorce, and Conti had assumed a caretaker role in the family. Neal and Kathleen were not "psychologically well-developed," and it was "like three children, in some respects, living together." Conti's home life was chaotic and unpredictable. There were a "multitude of emotional crises . . . particularly related to her mother," and Neal's work and Congregation activities left him little time for Conti. She was craving for adult

8

care at the time, and extremely vulnerable to manipulation. Fraser was not surprised that Conti did not disclose her sexual abuse during the counseling. Fraser had told Conti that she would be required to report such abuse, and Conti had "no safety" because she "was still rescuing both parents."

Congregation member Carolyn Martinez testified that she saw Kendrick and Conti together at Kingdom Hall, and that he "was very enamored with her. He just looked at her inappropriately. . . . I remember them holding hands. I remember his arm around her." Martinez said that she never saw Conti come to Kingdom Hall or field service without a parent, but more than once she saw Kendrick and Conti together in field service. Martinez recalled Conti sitting on Kendrick's lap in meetings at her home.

Elders Clarke, Abrahamson, Lamerdin, and three Congregation members testified that at Kingdom Hall they did not see Conti get hugs from Kendrick, sit on his lap, or leave with him as Conti testified. The Congregation members said they never saw Conti do field service with Kendrick.

An expert testified for Conti about Child Sex Abuse Accommodation Syndrome, which describes behaviors often exhibited by victims, including delayed reporting of their abuse. Physician notes in evidence state that Conti reported in August 2002 that she was sexually abused from around age nine to 13. Conti did not recall that doctor visit, but remembered disclosing the molestations to her parents in 2003. She disclosed the molestations to elders, including Clarke and Lamerdin, in 2009.

A psychologist who was counseling Conti at the time of trial testified that she suffered from depression, anxiety, and most severely from post-traumatic stress disorder (PTSD). A psychiatrist treating Conti testified that she was afflicted by PTSD due to the sexual abuse and she would require a lifetime of therapy. A psychiatrist qualified as an expert in child and adolescent psychology testified that Conti reported having been molested hundreds of times, that she had severe, chronic PTSD, and she would require therapy costing $160,000.

Anna Salter, a clinical psychologist and an expert on child sexual abuse testified for Conti that defendants, after learning that Kendrick had molested a child, did not meet

9

the standard of care for organizations that sponsor or promote activities that bring adults and children together. Salter said that, by 1993, the major religions and secular organizations conducting such activities had "adopted policies of transparency regarding known sex abusers." United Methodist Church policies, for example, were to "[u]phold the rights of children, speak out when abuses occur, and advocate for the strengthening and strict enforcement of these rights." Salter said that "people knew what the risk was when you had a child molester," and that the standard of care "was not to keep it secret and let the person continue in the same activities with the same access to children." The standard of care required "reporting these cases . . . and making people aware . . . if they had a sex offender in their midst."

Monica Applewhite, a clinical social worker and an expert on child sexual abuse, testified for defendants that Watchtower's policy against "disclosing private information . . . very closely mirror[ed]" the codes of ethics of the National Association of Social Workers and the American Counseling Association. Based on her review of the evidence, Applewhite opined that the Congregation never put Kendrick "into a position that required or allowed him to be alone with children, to be in supervision of children, [or] to spend time with children away from their families." Because the church's activities did not separate children from their parents, Appelwhite opined that its best means of protecting children was to educate parents about child sexual abuse, and it exceeded the standard of care for such education in the 1990's. According to Applewhite, the elders met the standard of care in Kendrick's case when they left it up to Evelyn and her daughter whether to tell the police about the abuse he admitted, and "they kept a special watch on him and paid attention to whether or not he had any inappropriate contact with children within the meetings at Kingdom Hall."

Conti sued Watchtower, the Fremont Congregation, and Kendrick for damages for sexual abuse, alleging willful acts by Kendrick and negligence on the part of defendants. The negligence consisted of failing to warn members of the Congregation that Kendrick was a child molester, and failing to restrict and supervise his participation in church activities. Conti executed a covenant not to execute on any judgment against Kendrick,

10

in exchange for his agreement not to participate in the case, or harass Conti or her witnesses. Conti obtained leave to add a cause of action for "acts of malice" supporting punitive damages against Watchtower, arguing that Watchtower acted despicably and with conscious disregard for the safety of others by maintaining a "secrecy policy" with respect to child sexual abusers despite knowing of their "high recidivism." The "secrecy policy" was set forth in the July 1989 letter we have quoted at length. Awareness of child abuse recidivism was exhibited in church publications such as the January 1, 1997 issue of The Watchtower, which stated that child sex abusers "may well molest other children. True, not every child molester repeats the sin, but many do."

The jury found Kendrick, Watchtower, and the Congregation liable, and apportioned fault 60 percent to Kendrick, 27 percent to Watchtower, and 13 percent to the Congregation. The jury awarded Conti $7,000,000 in compensatory damages, including $130,000 for future counseling and therapy, and $6,870,000 in non-economic damages. The jury awarded $21,000,001 in punitive damages against Watchtower. The court conditionally granted Watchtower's motion for a new trial on punitive damages, subject to Conti's acceptance of an $8,610,000 punitive damage award. Conti accepted the reduced punitive damages, and judgment was entered against Watchtower for $10,464,900, against the Congregation for $893,100, and against Watchtower and the Congregation jointly and severally for $130,000. Watchtower and the Congregation timely appeal.

## II. DISCUSSION

A. Introduction

Defendants initially demurred, and have consistently argued throughout the case that they had no duty to prevent Conti from being molested by Kendrick. The trial court overruled their demurrer, and rejected their subsequent arguments that no duty was owed on the facts of this case. The court declined to give defendants' proposed jury instructions that the Congregation had no duty to warn its members that Kendrick had committed an act of child sexual abuse, and that defendants were not liable unless Conti's abuse occurred on church property or during a church-sponsored activity.

11

Over defendants' objection, the court gave the following "duty" instruction to the jury: "The defendants . . . had a duty to take reasonable protective measures to protect [Conti] from the risk of sexual abuse by . . . Kendrick. In determining whether or not [defendants] took reasonable protective measures, you may consider the following: [¶] 1. The presence or absence of any warning; [¶] 2. Whether or not any educational programs were made available to plaintiff, her parents, or to other Jehovah's Witnesses from the [Congregation] members for the purposes of sexual abuse education and prevention; [¶] 3. Such other facts and circumstances contained in the evidentiary record here as to the presence or absence of protective measures."

"Duty is a question of law for the court, to be reviewed de novo on appeal." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770.)

B. <u>Failures to Warn</u>

(1) *Warning the Congregation*

Conti argued that the Fremont Congregation elders had a duty to warn members of the Congregation that Kendrick had molested a child and, as we have said, failure to fulfill that alleged duty was the sole basis for the punitive damage award against Watchtower. Congregation elders were following Watchtower's policy when they kept the molestation Kendrick reported confidential. We disagree with Conti that they had a legal duty to warn the Congregation about Kendrick.

" '[A]s a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129.) "This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter." (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435, fn. 5.) "The basic idea is often referred to as the 'no duty to aid' rule, which remains a fundamental and long-standing rule of tort law. . . . 'As a rule, one has no duty to come to the aid of another.' " (*Eric J. v. Betty M.* (1999) 76 Cal.App.4th 715, 727.) For instance, in *Eric J. v. Betty M.*, a convicted child molester sexually abused his girlfriend's minor child, and the molester's family members who did nothing "to facilitate any molestation" were not

liable for failing to warn the girlfriend about the molester's past. (*Id.* at pp.717, 727.) In *Eric J. v. Betty M.*, the court distinguished *Pamela L. v. Farmer* (1980) 112 Cal.App.3d 206, where the wife of a child molester who knew of her husband's past was subject to misfeasance liability for telling the parents of girls he sexually abused that the girls could safely swim at her house when she was away because her husband would be there to take care of them. (*Id.* at pp. 209-210; *Eric J. v. Betty M., supra,* 76 Cal.App.4th at p. 729.)

"Where, as here, a 'complaint alleges injuries resulting from the *criminal acts of third persons* . . ."the common law, reluctant to impose liability for nonfeasance, generally does not impose a duty upon a defendant to control the conduct of another [citations], or to warn of such conduct [citations], unless the defendant stands in some *special relationship* either to the person whose conduct needs to be controlled, or to the foreseeable victim of such conduct." ' " (*Roman Catholic Bishop of San Diego v. Superior Court* (1996) 42 Cal.App.4th 1556, 1564 (*Roman Catholic Bishop*), italics in original); see also Rest.2d Torts § 315; *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 293 ["one is ordinarily not liable for the actions of another and is under no duty to protect another from harm, in the absence of a special relationship of custody or control"].) In *Pamela L. v. Farmer,* the wife of the child molester "assumed that special relationship" with his new victims when she invited them to her home and assured them they could safely play there. (*Pamela L. v. Farmer, supra,* 112 Cal.App.3d at pp. 211–212.)

The alleged duty to warn cannot be justified in this case on the basis of a special relationship. Fremont Congregation elders were required, as Conti's expert put it, to make Congregation members aware that "they had a sex offender in their midst" only if: (1) members of a church have a special relationship with the church solely by virtue of that membership that requires the church to take affirmative steps to safeguard them against harm from other congregation members; or (2) a church has a special relationship with any member it has reason to believe may perpetrate such harm. (See generally, *Roman Catholic Bishop, supra,* 42 Cal.App.4th at p. 1564 [defendant must have a special relationship with the person whose conduct needs to be controlled, or the foreseeable

victims of such conduct].)  Conti makes neither assertion, and identifies no authority for any such broad duty on the part of a church to prevent its members from harming each other.

Rather, her arguments for a special relationship focus on the Congregation's custody or control of her and Kendrick.  She maintains that the Congregation "exerted custody and control over [her] by assigning her to perform field service with Kendrick," and "took charge of Kendrick when they determined where and with whom he was to perform field service."   But these arguments are material to the duty of care in connection with Kendrick's field service—a matter we discuss below—not to a duty to warn the Congregation that he had molested a child.

A number of cases have held that, where the issue is whether the defendant had a duty to protect the plaintiff from harm caused by a third party, the absence of a special relationship is dispositive and there is no reason to conduct the analysis prescribed in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), to determine whether a duty nevertheless existed.  "Because the traditional weighing process using [the *Rowland* factors] 'has already been done by courts over the centuries in formulating the "no duty to aid" rule,' in the context of liability for nonfeasance, it is not necessary to engage in [that] weighing process" where no special relationship exists.  (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1203, quoting *Eric J. v. Betty M., supra,* 76 Cal.App.4th 715, 729-730; see also *Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 438; but see *Nally v. Grace Community Church*, *supra*, 47 Cal.3d at p. 293 [applying both the special relationship doctrine and the *Rowland* factors in analyzing whether church pastors had a duty to prevent a foreseeable suicide].)  However, even if we were required to consider the *Rowland* factors, we would not conclude that the elders had a duty to warn the Congregation about Kendrick's past child sexual abuse.

The *Rowland* factors are:  "[T]he foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant

14

and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) "Forseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis." (*Castaneda v. Osher* (2007) 41 Cal.4th 1205, 1213.)

While it is readily foreseeable that someone who has molested a child may do so again, the burden the duty to warn would create and the adverse social consequences the duty would produce outweigh its imposition. The burden would be considerable because the precedent could require a church to intervene whenever it has reason to believe that a congregation member is capable of doing harm, and the scope of that duty could not be limited with any precision. For example, would the duty to warn be triggered by an accusation, or only an admission, of misconduct? Would one warning be sufficient, or would continuous warnings be required to ensure that new congregation members are alerted to the danger? Child molestation is a particularly heinous evil, but which other potential harms would the church have a duty to avert? Would the duty be limited to crimes and, if so, which ones? Imposition of a duty to warn would also have detrimental social consequences. It would discourage wrongdoers from seeking potentially beneficial intervention, and contravene the public policy against disclosure of penitential communications. No moral blame can be cast on defendants for adhering to that public policy.

The law generally protects the confidentiality of communications with clergy like those of Kendrick to the elders here. Under the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164, et seq.) clergy members such as a minister or similar functionary of a church or recognized denomination must report suspected child sexual abuse to law enforcement or a specified county agency. (Pen. Code, §§ 11165, 11165.6, 11165.7, subd. (a)(32), 11165.9, 11166, subd. (a).) However, this obligation does not arise when the clergy member is informed of the abuse during a "penitential communication," which is defined to mean "a communication, intended to be in confidence, including, but not

15

limited to, a sacramental confession, made to a clergy member who, in the course of the discipline or practice of his or her church, denomination, or organization, is authorized or accustomed to hear those communications, and under the discipline, tenets, customs, or practices of his or her church, denomination or organization, has a duty to keep those communications secret." (Pen. Code, § 11166, subds. (a), (d)(1).)

Similarly, clergy and penitents each have a privilege not to testify about penitential communications. (Evid. Code, §§ 1032, 1033, 1034.) " 'The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.' " (*Roman Catholic Archbishop of Los Angeles v. Los Angeles Superior Court* (2005) 131 Cal.App.4th 417, 443.) It has been argued that "the humanistic case for this privilege is stronger than the corresponding case for any other privilege. A person's religious beliefs lie at the core of the decisional autonomy needed to develop his or her life plan. In a philosophic sense, the person's chosen religious beliefs are arguably his or her most important life preferences." (Imwinkelried, The New Wigmore, Evidentiary Privileges (2nd.ed. 2010) § 6.2.3.b, p. 529.) The treatise observes that the United States Supreme Court has recognized "a constitutional 'right to believe . . . whatever religious doctrine one desires,' 'according to the dictates of his own conscience,' " and continues: "If the person has a constitutional right to independence in making religious choices, the recognition of an evidentiary privilege is an apt means of protecting that autonomy. If any type of relationship deserves the protection of an enclave shored up with an evidentiary privilege, it is a consultative relationship dealing with this kind of choice." (*Id.* at p. 531.)

Admittedly, neither mandatory reporting to the government nor evidentiary privilege control in this case. The privilege for penitential communications does not apply unless the communication is made "in the presence of no third person so far as the penitent is aware," a condition not satisfied at the Kendrick family meeting with the Congregation elders. (See *Roman Catholic Archbishop of Los Angeles v. Los Angeles Superior Court, supra,* 131 Cal.App.4th at pp. 444–445 [no privilege for communications

16

in church interventions with troubled priests because participants knew communications would likely be shared with more than one person].) Nor is it clear that Kendrick's communication was "penitential" as it is commonly understood given the elders' testimony that he said he touched his stepdaughter inadvertently. (Webster's Collegiate Dict. (10th Ed. 2001) p. 856 ["penitence" means "sorrow for sins or faults"].)

However, the public policy to protect the confidentiality of penitential communications that underlies the privilege and reporting statutes militates strongly against imposition of the duty claimed here to inform congregations of such communications. When the clergy member privilege was codified in Evidence Code section 1034, the California Law Revision Commission commented: "The extent to which a clergyman should keep secret or reveal penitential communications is not an appropriate subject for legislation; the matter is better left to the discretion of the individual clergyman involved and the discipline of the religious body of which he is a member." (7 Cal. Law Revision Com. (1965) p. 202.) Courts should likewise be wary to intrude in this realm.

Accordingly, we conclude that the elders of the Fremont Congregation had no duty to depart from Watchtower's policy of confidentiality and warn the members of the Congregation that Kendrick had molested a child. Since that "secrecy policy" was the only basis for the punitive damages assessed against Watchtower, the punitive damage award must be reversed.[3]

(2) *Failure to Warn Conti's Parents*

Congregation elders testified that they monitored Kendrick after learning that he had sexually abused a child, and would have disclosed his prior molestation to the parents of any child toward whom his behavior was inappropriate. In jury argument, Conti's

---

[3] In view of this conclusion, we need not reach Watchtower's arguments that the punitive damage award was not supported by substantial evidence, and was excessive as a matter of law. We also need not reach Watchtower's contention that imposition of a duty to warn the Congregation would unconstitutionally require the jury to assess the propriety of the church's religious beliefs.

counsel asked, "Did they really watch this guy like a hawk?" Conti and Congregation member Martinez testified that, at Kingdom Hall, Kendrick hugged Conti repeatedly, put his arm around her, held hands with her, had her sit on his lap, and "looked at her inappropriately"—the sort of behavior the elders said they were watching for, and if they had seen would have caused them to warn Conti's parents about Kendrick. Thus, if the elders had a duty to watch over Kendrick that included warning the parents of any child his actions might appear to threaten, there was substantial evidence from which to find that they breached the duty in Conti's case. However, we conclude that the elders had no such legal duty.

The reasons for our conclusion are largely the same as those that led us to reject the alleged duty to warn the Congregation about Kendrick. There was no special relationship between the church and all of the children in the Congregation simply because they were members of the church. Nor did the church have a special relationship with Kendrick, for purposes of a duty to monitor his behavior toward children, by virtue of control over his conduct with them. As for the *Rowland* factors, it would place an intolerably great and uncertain burden on a church to require that it continuously monitor a member for inappropriate behavior, and attempt to gauge when that behavior justified a warning about possible harm to another member. Telling individual parents that a member had molested a child would also conflict with the public policy of confidentiality for penitential communications. While such a disclosure would do less immediate damage to that policy than an announcement to the entire congregation, it would be naïve to think that word of the molester's behavior would not spread within the group.[4]

Nonetheless, the Congregation elders voluntarily undertook to watch Kendrick and, if necessary, warn individual parents about him, and the "negligent undertaking" doctrine, like the special relationship doctrine, is an exception to the "no duty to aid" rule. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 248-249.) Under the negligent

_____

[4] Since we conclude that the Congregation had no duty to warn any of its members that Kendrick was a child molester, we need not reach defendants' arguments that such a disclosure would have violated his rights to privacy and due process.

18

undertaking doctrine, "a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." (*Id.* at p. 249.) Neither of those conditions for liability is met here. Nine-year-old Conti was not relying on a church undertaking, and any lack of due care by the elders in monitoring Kendrick's interactions with children did not increase the risk of harm to her, it only failed to reduce that risk.

Therefore, defendants cannot be held liable for negligent failure by the elders to notice Kendrick's behavior with Conti and warn her parents that he posed a danger.

C. Failure to Limit and Supervise Kendrick's Field Service

Conti's case demonstrates the obvious threat that child molesters pose to children in a congregation when they perform field service. They are also a threat to children in the community when they engage in that activity. The prospect of children opening their doors to proselytizing child molesters is frightening. To avoid the risks posed by having child molesters in field service, Watchtower's asserted policy was to prohibit them from doing the service alone or with children. Watchtower has not disclaimed a duty to impose those restrictions, and could not plausibly do so since the restrictions were a professed policy it had adopted for very good reasons.[5]

However, the jury could conclude from the testimony of Watchtower official Shuster, quoted above in footnote 2, that Watchtower in fact had no such policy. When Shuster could not identify any documentation of that alleged policy, he abandoned any suggestion that Watchtower had uniform, church-wide rules on field service by child

---

[5] Watchtower arguably had a duty to altogether preclude field service by known child molesters. Evidence in Conti's case suggested that a determined molester could easily circumvent Watchtower's professed rules. According to her testimony, Kendrick was repeatedly able to isolate her from other congregants in the field. However, Conti has not argued that Watchtower's asserted policy was negligent, and we need not reach that issue.

19

molesters, and said that the policy was "specific to each individual situation." He said that Watchtower dealt with child molesters on a case-by-case basis, with letters of instruction to the elders of the molester's congregation.

Even if Watchtower had a policy of preventing known child molesters from performing field service alone or with children, there is no evidence that Watchtower did anything to implement that policy in Kendrick's case. Elder Abrahamson testified that Watchtower, not the Congregation, determined how matters such as the one involving Kendrick were handled. (Fn. 1, *supra*.) Shuster said that such matters were addressed by Watchtower through letters of instruction to the elders of individual congregations, but no such letter was produced in this case. Insofar as it appears from the evidence, Watchtower placed no limits whatsoever on Kendrick's field service.

Moreover, if Watchtower policy was to prevent a child molester from performing field service alone or with children, and even if that policy was communicated to the Fremont Congregation elders, substantial evidence was presented that the elders failed to see that the policy was carried out in Kendrick's case. Conti and Congregant Martinez testified that Kendrick and Conti performed field service together on multiple occasions. Conti described how Kendrick would separate her from field service groups, take her to his home, molest her, and then take her back to Kingdom Hall or the service group. The jury could find from this evidence that the elders were negligent in failing to supervise Kendrick's field service.

In this respect, Conti's case is similar to *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377 (*Juarez*). In *Juarez*, the plaintiff was repeatedly molested by a scoutmaster "during officially sanctioned scouting events, such as overnight camping trips. . . ." (*Id.* at p. 385.) Before the molestations occurred, the Boy Scouts had identified child sexual abuse as a serious problem, and had developed "a comprehensive 'Youth Protection Program'" designed to prevent it. (*Id.* at p. 398.) The program included guidelines prohibiting an adult from sleeping in a tent with an unrelated scout, and requiring that two adults be present at any scouting activity. (*Id.* at p. 400.) The offending scoutmaster broke these rules, and the other scoutmaster of the troop said that

20

he was never informed of them. (*Ibid.*) The plaintiff argued that the Boy Scouts had a duty to take reasonable measures to protect him from the molestations, and that they breached this duty because, among other things, they failed to implement their child protection policies in his case. (*Id.* at pp. 385, 400.) The court reversed a summary judgment for the Boy Scouts, finding that a duty was owed under the special relationship doctrine and the *Rowland* factors, and that there were triable issues of fact as to whether the duty was breached. (*Id.* at pp. 400–413.)

We likewise conclude under the special relationship doctrine and the *Rowland* factors that defendants had a legal duty to exercise due care to prevent Conti from being molested during her church-sponsored field service. They could be found to have breached that duty by failing to implement Watchtower's proclaimed limitations on field service by child molesters like Kendrick.

For purposes of the special relationship doctrine, defendants exerted control over Conti and Kendrick's field service in several ways. Watchtower determined that child molesters like Kendrick remained eligible to perform field service, and thus presumably could have banned him from that activity had it chosen to do so. The testimony showed that the Congregation determined when, where, and with whom field service was to be conducted. The members went to group meetings scheduled by the elders where partners and the areas of service were assigned. Elder Abrahamson testified that he controlled where the members went so that neighborhoods would not be inundated with proselytizing. Abrahamson said that a single male was never assigned to do field service with a single female, and that children were never partnered with adults other than their parents. Elder Clark said that Kendrick was not assigned to do field service with a child, and characterized any such assignment as "suicidal" for the elders. But Conti and Martinez testified that Conti and Kendrick often ended up in field service together. It could be reasonably inferred from this testimony that, even if Conti and Kendrick were never partnered together by the elders, the elders facilitated his access to her by putting them in the same group from which partners were assigned, and sending them out with the group to the same neighborhood. Most importantly, the Congregation had the ability

21

to control Kendrick's access to children in the field by keeping an adult with him at all times as required by Watchtower's professed policy.

The Fremont Congregation states in its briefs that field service is "a personal ministry, not a required congregation function or activity," and that Conti "presented no evidence that [defendants] had the ability to control when, or even if, a congregation member will decide to engage in their door-to-door ministry. Preaching from door-to-door is an activity that individual Jehovah's Witnesses only engage in when they feel motivated to speak about God." Even if the Congregation could not require field service, the evidence established that, when members wanted to do field service, Watchtower determined whether they were eligible and the Congregation controlled the manner in which the service was performed.

Watchtower writes in its briefing: "[Conti] . . . testified that Kendrick sexually abused her at his home *after* field service activity . . . . During closing argument, [Conti's] counsel incorrectly suggested to the jury that plaintiff was abused by Kendrick *during* field service. . . . The record demonstrates, however, that [Conti] never testified to being molested by Kendrick during field service." (Italics in original.) But, as we have said, Conti testified that Kendrick molested her while they were supposed to be performing field service, which to us means "during" field service. If Watchtower's point is that the molestations occurred at his home, rather than in "the field," the distinction is immaterial. While the Congregation may not have been able to police Kendrick's behavior after scheduled field service was over, it could have controlled his access to Conti during the field service.

For these reasons, the facts here are distinguishable from those in *Roman Catholic Bishop, supra,* 42 Cal.App.4th 1556, on which defendants rely, where summary judgment was affirmed for the church in a suit based on molestation of a minor by a priest. The court rejected the victim's claim that the church " 'entrusted [her ]to [the priest's] care.' " (*Id.* at p. 1567.) There were "no specific allegations or facts the church somehow placed [the victim] in [the priest's] actual custody or control. Rather, the various police reports . . . indicated nearly all of the contact [the victim] had with [the priest] occurred

22

when [the priest] took [her] from her home to various public places and hotels. [The victim] did not attend a church school, where an affirmative duty to protect students may exist." (*Ibid.*) Here, Conti was harmed during a church-sponsored activity, and defendants' control over that activity placed them in special relationships with Kendrick and Conti thus requiring them to take reasonable steps to prevent the harm from occurring.

The *Rowland* factors point to the same conclusion. It is foreseeable that a child molester will reoffend, and the risk is heightened when the molester is put in a position, as Kendrick was here, to be alone with a child. Defendants will not be heavily burdened by a duty to take reasonable care to ensure that molesters are accompanied by another adult, and no children, in the field. Defendants cannot claim that imposition of this duty would be unduly burdensome when it was Watchtower's avowed policy. Moreover, recognition of a duty of reasonable care in the supervision of known child molesters in the field furthers the policy of preventing future harm without affecting the confidentiality of penitential communications.

We therefore conclude that defendants had a duty to use reasonable care to restrict and supervise Kendrick's field service to prevent him from harming children in the community and in the Congregation. Conti's testimony provided substantial evidence that defendants breached this duty.

D. Jury Instructions

(1) *Duty to Protect Conti from Harm*

Over defense objection, the court instructed the jury that it could consider the "absence of any warning" in deciding whether defendants took reasonable measures to protect Conti from being molested by Kendrick. In the context of this trial, in which such heavy emphasis was placed on the failure to give a warning—which we have concluded defendants were under no duty to give—this instruction was misleading to the extent it

could be misunderstood to indicate that liability could be predicated on the failure to warn.[6]

Conti argues that the error was waived. But, we cannot agree. Defendants argued throughout the case that they had no duty to take any action whatsoever to protect Conti from being molested by Kendrick, an argument that subsumed objections to any instruction permitting a finding of liability for either a failure to warn or supervise. Thus, there was no waiver. (See also *Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 7 [no objection at trial required to challenge erroneous instruction on appeal].)

"Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) Relevant considerations include: "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indication by the jury that it was misled." (*Id.* at pp. 580–581.)

As for the state of the evidence and as we have said, there was substantial evidence to support a finding that the Congregation failed to take reasonable precautions to ensure that Kendrick was accompanied by an adult during field service, and did not end up alone with Conti during that activity. As for the effect of other instructions, the duty instruction did not tell the jury that the absence of any warning was the only relevant factor for its consideration. The instruction stated broadly that the jury could also consider defendants' efforts on sex abuse education and prevention, and "such other facts and circumstances contained in the evidentiary record here as to the presence or absence of protective measures."

As for the effect of counsel's arguments, Conti's jury arguments emphasized the failure to warn Congregation members that Kendrick had molested a child, consistent with what her counsel described as Watchtower's "policy of secrecy which allows for an

---

[6]This is not to say that whether a warning was given will necessarily be irrelevant in all cases. For example, if the elders had warned the Congregation or Conti's parents that Kendrick had molested a child, they would undoubtedly cite the warning in defense of any claim that they failed to take adequate precautions, even though the law did not require that the warning be given.

identified child sex offender to strike again." In his opening statement, counsel argued: "The governing body, through this policy, had made a determination that its own needs would be placed above protection of children and [showed] an indifference to children like [Conti] who were placed at risk by the presence of known sexual abusers within the congregations and the secrecy that surrounded it. [¶] That is what this case is about." In closing argument, counsel reiterated "we are here" because a "policy that keeps secret known child molesters in the congregations is wrong and needs to be changed."

However, Conti's arguments were not confined to failure to warn. Her counsel argued that field service was where Kendrick "got the best opportunity to abuse her. [¶] Now, that is actually related to the Jehovah's Witnesses because field service is what they do." Counsel argued further that defendants "didn't restrict Mr. Kendrick in any way that was meaningful. [¶] He is still a minister. He is still Brother Kendrick. [¶] He is still a member in good standing of the congregation. [¶] He is still sitting or sleeping in the back row or whatever it was of the Kingdom Hall there with children and adults all present. [¶] He is still a baptized publisher going out in the neighborhoods and collecting and spreading the Jehovah's Witnesses message. [¶] He is doing all of that with children. [¶] Now we heard from Mr. Shuster that there is a policy. 'No, he would never have been allowed to go out into field service with a child. That's our policy.' And when I say, 'Okay, well can I see it?' [¶] No policy produced."

It is apparent from the punitive damage award against Watchtower that the jury was misled by the failure to warn theory to a certain extent. We note also that the jury's allocation of fault—27 percent to Watchtower and only 13 percent to the Congregation—in apportioning Conti's noneconomic damages would be inconsistent with liability associated with field service if the only basis for that liability was failure to supervise Kendrick in the field. Our discussion of field service liability has focused primarily on that failure, and the Congregation, not Watchtower, was responsible for it. However, as we have explained, there were also grounds to hold Watchtower independently and primarily liable for negligence connected with field service. Watchtower, not the Congregation, dictated the conditions under which field service by child molesters was

25

permissible.  The jury could have found that Watchtower falsely claimed to have a policy that prevented child molesters from performing field service alone or with children, or, even if it had that policy, it did not impose the policy on the Congregation or Kendrick.

Therefore, weighing the *Soule* factors, we do not find it reasonably probable that the compensatory damages verdict would have been different if the warning instruction had not been given.

### (2) *Allocation of Fault to Non-Parties*

Defendants contend that the court erred in denying their request to have the jury consider assigning some responsibility for Conti's injury to entities and individuals who are not parties to the litigation.  We disagree.  Defendants argue that, if the Congregation had a duty to warn the members that Kendrick had molested a child, then the police, the child welfare agency, and the district attorney who responded to the report of that molestation also had that duty because they "all had information [about the incident] superior to that possessed by Fremont Congregation elders."  But defendants did not have the duty to warn on which this argument is predicated.  Defendants contend that Conti's parents could be found at least partially responsible for the harm she suffered because they were negligent in supervising her and entrusting her to Kendrick's care.  However, the court properly refused to allow attribution of fault to Conti's parents given the absence of any evidence they had reason to know Kendrick was a threat to her.  (See *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152, 156–158 [parent must have actual knowledge of threat of molestation to be liable for negligent supervision of the victim; such knowledge was not established by perpetrator's allegedly "excessive" gift-giving and attention paid to minor].)

### III.  DISPOSITION

The judgment against defendants on the negligence count is affirmed.  The judgment against Watchtower on the cause of action for punitive damages is reversed with directions to enter judgment for Watchtower on punitive damages.  The parties are to bear their own costs on appeal.

26

                           _____

                           Siggins, J.

We concur:

_____

Pollak, Acting P. J.

_____

Jenkins, J.

Trial Court:                                        Alameda County Superior Court


Trial Judge:                                        Robert D. McGuiness


Counsel:

Watchtower Bible & Tract Society of New York, Mark F. Moreno; Boudreau Williams, Jon R. Williams;  Jackson Lewis, Robert J. Schnack, for Defendant and Appellant Watchtower Bible & Tract Society of New York.

The McCabe Law Firm, James M. McCabe for Defendant and Appellant Fremont California Congregation of Jehovah's witnesses, North Unit.

Furtado, Jaspovice, & Simons, Richard J. Simons, Kelly I. Kraetsch for Plaintiff and Respondent, Candace Conti.