Filed 4/14/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSE LOPEZ, | D066388 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00099849-CU-PO-CTL) |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Joan M. Lewis, Judge. Reversed.

Williams Iagmin and Jon R. Williams for Defendant and Appellant.

The Zalkin Law Firm, Irwin M. Zalkin and Devin M. Storey; Pine & Pine, Norman Pine and Scott Tillet, for Plaintiff and Respondent.

Jose Lopez sued the national Jehovah's Witnesses organization, Watchtower Bible and Tract Society of New York, Inc. (Watchtower), alleging his Bible instructor sexually abused him in 1986 when he was a child. Lopez asserted several legal theories, including failure to warn, negligent supervision, and negligent hiring/retention. After contentious

discovery disputes, the court issued two discovery orders against Watchtower: (1) compelling the deposition of an individual (Gerrit Lösch) whom the court found was a "managing agent" of Watchtower; and (2) ordering the production of documents in Watchtower's files pertaining to other perpetrators of child sexual abuse. When Watchtower failed to comply with these orders, the court granted Lopez's motion for monetary and terminating sanctions, struck Watchtower's answer, and entered Watchtower's default.[1]

On appeal, Watchtower challenges the validity of the discovery orders and contends the court abused its discretion in failing to impose lesser sanctions. We reject Watchtower's challenges to the document production order, but conclude the court erred in ordering Watchtower to produce Lösch for his deposition. The factual record does not support the court's finding that Lösch was Watchtower's "managing agent" and therefore the court erred in sanctioning Watchtower for Lösch's nonattendance at the deposition. (See Code Civ. Proc., §§ 2025.280, 2025.450.)[2] We additionally conclude that under the particular circumstances of this case, the court erred in issuing terminating sanctions as the initial remedial measure without first attempting to compel compliance with its discovery orders by using lesser sanctions and/or by imposing evidentiary or issue sanctions.

---

[1] The court later entered a default judgment in Lopez's favor for $13.5 million. This judgment is the subject of a separate appeal.

[2] Statutory references are to the Code of Civil Procedure unless otherwise specified.

Accordingly, we reverse the order compelling the Lösch deposition and the entry of default based on the terminating sanctions. We remand for the court to consider the appropriate sanctions for Watchtower's violation of the document production order. The initial measure should be a remedy that is less onerous than a terminating sanction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Summary of Allegations*

The Jehovah's Witnesses is a religion with more than 1.2 million members in about 13,777 congregations in the United States. During the relevant times, Watchtower supervised the local congregations and was responsible for the religion's policies and administrative matters. Jehovah's Witnesses congregations are comprised of elders (spiritual leaders responsible for congregation governance), ministerial servants (performing administrative tasks), and various levels of baptized members, including publishers (rank-and-file members). As stipulated by the parties, congregation elders serve as agents for Watchtower.

In June 2012, 34-year-old Lopez filed a complaint against Watchtower and the Linda Vista Spanish Congregation of Jehovah's Witnesses (Linda Vista congregation), seeking damages for sexual abuse committed by Gonzales Campos in 1986 when Lopez was about seven years old. In his amended complaint, Lopez alleged that in the mid-1980's, Lopez's mother was a baptized Jehovah's Witnesses member associated with the Linda Vista congregation, and received Bible study from a congregation elder, Joel Munoz. Munoz recommended to Lopez's mother that Lopez should be receiving Bible study instruction and she "should approach [Campos] because he was very good with

3

children." Following this direction, Lopez's mother spoke with Campos and Campos began giving lessons to Lopez. After Campos had given Lopez several Bible study lessons, and in the context of a Bible study lesson, Campos sexually molested Lopez.

Lopez reported the abuse to his mother, who reported it to Elder Munoz and his wife. The next day, several elders from the Linda Vista congregation came to Lopez's home and spoke to Lopez's mother about the abuse. One of the elders asked Lopez to show him, on a teddy bear or doll, where Campos had touched him. Soon after, Lopez's family left the congregation and Lopez had no additional contact with Campos.

At the time of the abuse, Campos was directed by Linda Vista congregation leaders to provide Bible instruction to Lopez and other minors. In giving the Bible study lessons to minors, Campos filled out a form for each study session, identifying the Bible study student, address, and date of the lesson, and submitted each form to a congregation elder.

About four years earlier, in approximately 1982, Campos had allegedly sexually molested another young boy from the Linda Vista congregation. Soon after the abuse, this earlier victim reported the abuse to his mother, who reported the abuse to two church elders. When questioned by the elders, Campos confessed to acting inappropriately. The elders nonetheless continued to hold Campos out as safe to be around children, and affirmatively recommended him to serve as a Bible study instructor.

Campos had been a member of the Linda Vista congregation since about 1979. In 1987, Campos became associated with another Jehovah's Witnesses congregation (La Jolla Spanish Congregation of Jehovah's Witnesses, also known as Playa Pacifica

4

Spanish Congregation of Jehovah's Witnesses (La Jolla congregation)). In about 1988, La Jolla congregation elders appointed Campos to a ministerial servant position, and Watchtower approved the appointment. While serving as a ministerial servant, Campos frequently preached at the Linda Vista and La Jolla congregations, and continued to teach Bible study to Jehovah's Witnesses children. In 1993, Watchtower approved Campos's appointment as elder of the La Jolla congregation, and he was later appointed secretary of the congregation, placing him on the congregation's governing "Service Committee."

Lopez alleged that Campos sexually abused at least eight other Jehovah's Witnesses children between 1982 and 1995, including when Campos served as an elder. Some of these abuse incidents were reported to congregation elders.

Based on these allegations, Lopez's amended complaint asserted six causes of action against Watchtower and the Linda Vista congregation: negligence; negligent supervision/failure to warn; negligent hiring/retention; negligent failure to warn, train or educate; sexual battery; and sexual harassment. Lopez alleged defendants were negligent because they knew or should have known of Campos's "dangerous and exploitive propensities and/or that [he] was an unfit agent"; they allowed Campos to come into contact with Lopez without supervision; they failed to tell or concealed from Lopez and his parents that Campos had previously sexually abused minors; they failed to tell law enforcement officials that Lopez had been sexually abused, making it less likely Lopez would receive medical/mental health care and treatment; and they held out Campos to Lopez and his parents as being in good standing and trustworthy. Lopez claimed "[b]y retaining and promoting [Campos] after learning of his past sexual abuse of children,

5

[Watchtower] ratified and authorized [Campos's] conduct."  Lopez alleged "[d]efendants acted with willful and conscious disregard of the rights and safety of others by repeatedly ignoring warnings and complaints that [Campos] had committed acts of sexual abuse upon minors and allowing [Campos] to attain and retain elevated positions within the Jehovah's Witness[es] religion . . . [w]here he had access to unsuspecting minors."

Lopez alleged the lawsuit was timely under California law.  (See § 340.1, subds. (a), (b)(1), (2).)  Lopez claimed Campos's sexual abuse resulted in "various psychological coping mechanisms" that precluded him from "ascertaining the resulting damages from that conduct, or the wrongfulness of [Campos's] conduct" and that he did not discover the "causal relationship between the molestation and adulthood psychological injuries" until April 2012.

Lopez later amended the complaint to add a punitive damage claim.

### B.  *Discovery Disputes*

#### 1.  *Discovery Relating to Campos's Molestation of Others*

At some point before February 2013, Lopez propounded document requests on Watchtower.  The requests sought documents pertaining to written complaints and investigations concerning Campos's sexual abuse of other victims.  Watchtower identified responsive documents, but declined to produce them on the basis of the First Amendment, overbreadth, clergy-penitent privilege, and third-party privacy rights.  Watchtower also refused to produce any documents generated after the date Lopez was allegedly abused (1986), stating the documents were not relevant or admissible, and thus not discoverable.

6

Lopez moved to compel the production of the documents, and the court granted the motion in part. After briefing and a hearing, the court broadly rejected Watchtower's arguments regarding scope, overbreadth, privacy, and the First Amendment. On the penitential-communications privilege, the court conducted an in camera hearing, and found all but four of the withheld documents were not protected. In reviewing the documents, the court applied the rule that documents created with the knowledge they would be read by third parties were not protected by the penitential-communications privilege. (See Evid. Code, § 1032.)[3]

### 2. *Deposition Notices at Issue in this Appeal*

Several months later, in August 2013, Lopez's counsel notified defense counsel of his intent to notice several depositions, including (1) Watchtower's person most qualified (PMQ); and (2) Gerrit Lösch, a member of a Jehovah's Witnesses entity known as the "Governing Body."

On September 20, 2013, Lopez noticed the deposition of Watchtower's PMQ on 30 identified subject matters. The notice requested the deponent to produce 29 separate categories of documents similar to the identified subject matters. The topics and requested documents related to Watchtower's organizational structure, including its

---

3     California law defines a " 'penitential communication' " as "a communication made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member's church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, has a duty to keep those communications secret." (Evid. Code, § 1032.)

committees and the Governing Body; the formulation and implementation of

organizational policies; reports of childhood sexual abuse within the organization from

1979 through the current date, including sexual abuse perpetrators other than Campos;

and Watchtower's handling of sexual abuse notifications.

Two requests are of particular relevance here because Watchtower's failure to

provide any documents responsive to these requests was one ground for the court's

terminating sanctions order.  Request No. 5 sought:

> "Any and all individual written accounts, reports, summaries, letters,
> emails, facsimiles, and records, whether or not compiled, concerning
> reports of sexual abuse of children by members of the Jehovah's
> Witnesses, including but not limited to, Governing Body members,
> district overseers, circuit overseers, elders, ministerial servants,
> pioneers, publishers, baptized publishers, and individuals from the
> time period of 1979 to the present."

Request No. 12 sought:

> "All letters, emails, facsimiles, or other documentary, tangible, or
> electronically stored information of any kind, Watchtower Bible and
> Tract Society New York, Inc. received in response to the Body of
> Elder Letter Dated March 14, 1997."[4]

On October 9, Watchtower served objections to the requested documents.  Those

objections included:  (1) the documents seek information protected from discovery by the

---

[4]     The March 14, 1997 letter instructed elders to send a written report to Watchtower
about "anyone who is currently serving or who formerly served in a [Watchtower]-
appointed position in your congregation who is known to have been guilty of child
molestation in the past."  Watchtower said this information should be kept confidential,
and instructed elders to place the reports in a " 'Special Blue' " envelope.  The March 14
letter also reminded elders of prior letters stating that when a known "*child molester*"
moves to another congregation, a letter of introduction should be sent to the new
congregation and copies of the letter should be sent to Watchtower in the " 'Special Blue'
envelopes."

penitential-communications privilege; (2) the documents are protected by the attorney-client privilege and/or work-product doctrine; (3) the requests are "overly broad as to time" and not reasonably calculated to lead to admissible evidence; (4) the disclosure of the documents would violate third-party privacy rights; (5) the requests violate Watchtower's First Amendment rights to religious freedom; and (6) the requests are unduly burdensome with the intent to harass Watchtower and solicit other clients.

In late October 2013, the court held a hearing on defendants' summary judgment motion pertaining to the statute of limitations. After hearing argument, the court denied the motion. The court then noted the upcoming trial date (in January 2014) and asked the parties whether they had resolved their discovery disputes regarding the PMQ deposition. The parties reminded the court it had ordered the parties to meet and confer on discovery referees and notified the court that they had agreed on three names. The court then randomly chose one of those names to serve as discovery referee: former San Diego County Superior Court Judge Vincent Di Figlia (Referee).

On November 7, 2013, Lopez served Watchtower with a notice of Lösch's deposition. Watchtower objected to the deposition on the ground it "violates the 'apex-deposition rule' " (a rule prohibiting the deposition of a high-ranking official unless the deponent has unique or superior personal knowledge of relevant information). Watchtower also challenged the proposed scope of the deposition.

### 3. *Summary of Parties' Assertions Before Referee*

The Referee scheduled a December 13 hearing to resolve the parties' disputes regarding (1) the PMQ deposition and document requests; and (2) Lösch's deposition.

9

Lopez and Watchtower each submitted briefs regarding their respective positions on these matters.

On the PMQ document requests, Lopez argued the pre-abuse, postabuse, and other-perpetrator evidence was relevant to several issues in the case, including notice, ratification, and punitive damages. Lopez also argued the trial court had rejected many of Watchtower's objections in ruling on the prior discovery and summary judgment motions, and the same legal principles apply to the current document requests, including those seeking postabuse and other-perpetrator information. On Watchtower's penitential-communications privilege claim, Lopez argued that (as the trial court had previously found) this privilege did not apply to documents containing statements made with knowledge that the statements would be disclosed to third parties. Regarding Watchtower's privacy claim, Lopez proposed that the Referee allow redaction of third-party names and identifying information.

On the Lösch deposition, Lopez asserted that Lösch is currently the longest serving member on the Governing Body, and has information relevant to the formulation and implementation of the organization's policy on childhood sexual abuse matters, as well as specific matters concerning sexual abuse by Campos. In support, Lopez submitted the deposition testimony (taken in another case) of Allen Shuster, a Jehovah's Witnesses elder who has served in the Watchtower organization since 1981. Shuster testified the Governing Body "is a committee that oversees the worldwide activity of Jehovah's Witnesses," and is responsible for approving policies and guidelines governing

the religion and the religious organization, including those contained in Watchtower documents known as Body of Elder letters pertaining to child sexual abuse matters.

In opposing the PMQ requested documents, Watchtower argued the requests were overbroad and sought irrelevant information, and asked the Referee to limit the discovery to a reasonable time surrounding the date of the alleged abuse (1986) and to preclude all discovery involving perpetrators other than Campos. Watchtower also argued the requests seek information protected by attorney-client privileges, the First Amendment, and the penitential-communication privilege. Although Watchtower challenged the broad scope of the requests, Watchtower did not specifically argue (or present any evidence showing) that responding to the requests would be administratively burdensome.

Regarding Lösch, Watchtower withdrew its apex-doctrine objection, but argued the deposition notice was void on its face because Lösch is not an " 'officer, director, managing agent or employee' " of Watchtower and thus a deposition subpoena was required under section 2025.280, subdivision (b). In support Watchtower proffered the declaration of its employee Danny Bland, who stated that based on his search of Watchtower records, "Losch [has] never . . . been an officer, director, managing agent or employee of Watchtower." Watchtower also asserted that a California deposition subpoena would be ineffective to compel Lösch's deposition because he is a New York resident. Watchtower additionally argued that any information regarding the structure, composition, and activities of the Governing Body is irrelevant because the Governing Body is a separate entity from Watchtower.

## 4. *Referee Recommendation*

The Referee held a hearing on December 13, 2013, at which both counsel had an extensive opportunity to present their arguments. Several days after the hearing, Watchtower requested permission to submit additional information regarding the Jehovah's Witnesses' organizational structure, and the role of the Governing Body within this structure, including that Lösch's role is solely one of a spiritual leader ("akin to the Dalai Lama") and not "a corporate managing agent." The Referee denied the motion, concluding the issues had been fully briefed.

Shortly after, on December 20, the Referee issued a written order (Referee Recommendation) concluding that Lopez should be permitted to depose Lösch in New York as a "managing agent" and that Watchtower produce the documents requested in the PMQ deposition notice (including Request Nos. 5 and 12).

Regarding Lösch, the Referee stated: "The deposition testimony of Mr. Shuster establishes that the Governing Body . . . is the principal overseer of the church's activities. Mr. Losch is the longest serving member of the Governing Body and may well possess knowledge pertinent to this litigation." The Referee also noted: "According to deposition testimony given by Shuster . . . , the Governing Body approves operational guidelines for the United States branch of the Jehovah's Witness[es] Organization, including directives for investigating and reporting of alleged childhood sexual abuse within the church." The Referee said that "[d]espite Mr. Bland's declaration, the referee believes that Mr. Losch's position as a member of the Governing Body and its functions

12

as described by Mr. Shuster, make Mr. Losch a managing agent" under section 2025.280, subdivision (a).

On the document requests, the Referee rejected each of Watchtower's objections, including its blanket privilege and overbreadth claims. The Referee stated: "It is [my] recommendation that the deposition of the PMQ be allowed to go forward on the topics enumerated, and that the PMQ be required to produce the documents in question which I believe are relevant to the subject matter of the lawsuit in many areas, including subsequent ratification by the church, if any."

The Referee qualified its ruling in two ways. First, the Referee stated that to protect the "privacy rights of third parties, defendants may produce documents wherein the names, addresses, e-mail addresses, telephone numbers and social security numbers of third-parties have been redacted." Second, the Referee stated, "in that the court has previously reviewed in camera and withheld some documents pursuant to Evidence Code §§ 1033 and 1034, the referee recommends that defendant prepare a privilege log and provide for in camera review by me those documents which may fall within the minister-communicant and/or attorney/client or work produc[t] privileges."

### 5. *Parties' Responses to Referee Recommendation*

One week later, on December 26, Lopez filed an ex parte application requesting the court to compel Watchtower's compliance with the Referee's Recommendation.

The next day, Watchtower filed objections to the Referee's Recommendation under section 644, subdivision (b). With respect to Lösch, Watchtower argued the Referee misunderstood Shuster's testimony and that the Governing Body is purely a

13

religious committee that provides guidance on religious practice. Watchtower also argued there was no evidence showing Lösch was an officer, director, or managing agent of Watchtower and thus the court lacked authority to compel Watchtower to produce Lösch for his deposition. In support of these arguments, Watchtower proffered Shuster's new declaration, stating: "[T]he Governing Body . . . is not a committee that operates within the corporate structure of Watchtower . . . and it does not make corporate policy or decisions for Watchtower . . . . Rather, the Governing Body is a religious body that provides spiritual guidance to Jehovah's Witnesses worldwide."

On the document production, Watchtower argued the Referee erred by failing to rule on each objection, and instead improperly "lump[ed]" the requests into a single category. Watchtower also urged the court to reject the Referee's findings because the requests were overbroad as to time and the order would impose an "enormous" administrative burden. In support of the burden argument, it produced three new declarations, none of which were before the Referee.

First, Watchtower produced the declaration and supplemental declaration of Richard Ashe, Jr., the person designated as Watchtower's PMQ, who has been an elder since 1982 and has worked in Watchtower departments (the United States branch offices and the Service Department) since 1999. Ashe stated in part:

> "All of the confidential letters from bodies of elders written to
> Service Department elders at Watchtower in response to the March
> 14, 1997, letter are filed and maintained in the individual
> confidential congregation Service Department files for nearly 14,000
> congregations of Jehovah's Witnesses in the United States."

14

"Most of these 14,000 congregation Service Department files do not have any documents related to child sexual abuse. . . ."

"The typical congregation . . . file has hundreds of pages, most of which are unrelated to the issue of child abuse or child molesters. [¶] . . . [¶]  In order to review the documents in these confidential files it would be necessary for a Service Department elder to physically go through each of the nearly 14,000 congregation Service Department files to determine if among the hundreds of pages of documents in each file there happened to be any correspondence related to the March 14, 1997, letter to all bodies of elders or the issue of child abuse."

"Only a handful of elders at [Watchtower's national office] are qualified and capable of going through these confidential congregation files.  At a minimum, it would take an average of three to four hours to go through each of the nearly 14,000 files.  That would mean that it would take one . . . elder approximately 56,000 hours which works out to be 7,000 days (19.17 years), assuming he searched for the requested documents for . . . 8 hours per day.  The number of days could be reduced to 2,334 days (6.39 years) if three . . . elders were assigned this task.  Assuming the . . . elders who first reviewed the files were to be paid New York's current minimum wage of $8.00 per hour, the reasonable value of their time would be $448,000."

"Given the spiritual responsibilities and workloads of the elders in the U.S. Service Department it would not be possible to accomplish these file reviews without stopping all of their other current tasks and responsibilities.  This would cripple or severely hamper the operation of [Watchtower's service department] and be a spiritual detriment to the congregations that its elders serve."

Watchtower also produced the declaration of its general counsel, Philip Brumley, who stated the Referee's order would require Watchtower attorneys to review 13,777 files and "to turn over files" containing privileged attorney-client communications and work-product information, and would subject Watchtower attorneys to ethics violations and malpractice claims.  Brumley stated the preparation of privilege logs would take

15

"thousands of hours" and prevent the legal department from providing needed legal advice to elders.

Watchtower also asked the court to remand the matter back to the Referee because the "hearing . . . addressed only the scope of the [permitted] testimony" and "did not include or address the objections that had been made to the *document production*." Watchtower claimed the Referee did not consider its numerous objections, based on "privilege, rights of privacy of third persons, attorney work product doctrine, and the undue burden that the search, assembly and redacting of these documents would cause upon Watchtower."

In response to Watchtower's objections, Lopez argued Watchtower was not entitled to challenge the Referee's determinations because the parties had agreed to submit the issues to the Referee. (See § 644, subd. (a).) Lopez alternatively opposed Watchtower's arguments on their merits, and stated the Referee had expressly considered and rejected each of Watchtower's objections to the discovery. On Lösch's deposition, Lopez argued the Referee properly found Lösch was a party-affiliated witness ("a managing agent") and thus Lösch's deposition notice served on Watchtower was sufficient to compel his attendance. Lopez maintained that the Referee was entitled to rely on Shuster's deposition testimony and to reject Watchtower's contrary evidence.

On the document requests, Lopez objected to Watchtower raising the new administrative-burden argument, but also urged the court to reject this new claim based on evidence showing Watchtower specifically directed congregation elders to send reports about any person in an appointed position "*known to have been guilty of child*

16

*molestation*," and instructed elders to place the reports in " 'Special Blue' envelopes" and that the reports "should be marked 'Do Not Destroy' and be kept indefinitely."  Lopez argued that given these documentation requirements, it was not reasonable to conclude Watchtower would need to search through each individual congregation file to locate the responsive documents.

C.  *January 2 Hearing and Order Affirming Referee Recommendation*

At the January 2 hearing, the court initially expressed concern with the scope of the issues before it at an ex parte hearing and indicated it had not yet reviewed the Referee Recommendation or Watchtower's objections.  However, as explained in more detail below, the court then permitted the parties to argue their points at length (including the relevance of the evidence and administrative burden issue), asked questions, and reviewed the submitted paperwork.

At the conclusion of the arguments, the court requested Watchtower's counsel to give a reasonable time estimate to locate the responsive documents, stating defense counsel's claim it would take "nine and a half years . . . seems ludicrous."  Watchtower's counsel said the "calculations worked out to be 19.7 years with one person working seven days a week, eight hours a day, and flying all over the countryside.  And then you use three people, and we can knock it down just shy of seven years. . . ."

After additional discussion, the court stated it was adopting the Referee Recommendation, and would continue the trial date 120 days to June 27.  The court said, "I don't want to have anybody coming back in to tell me they couldn't find the

17

documents." In its written order (the January 2 order), the court stated it had reviewed the Referee Recommendation "and makes it an order of the Court."

D. *Motions After January 2 Order*

One month later, on February 4, Watchtower moved to stay the court's January 2 order, stating it intended to file a writ petition with the Court of Appeal. The court denied the motion, finding a stay was not warranted unless it was imposed by a higher court. At the end of the hearing, the court rejected Watchtower's suggestions it had not adequately reviewed Watchtower's prior objections, stating "[the court] looked at the objections on the date that you came in. You were here last [on the calendar]. And I went ahead and signed an order adopting [the Referee Recommendation]." The court also ordered counsel to "get that deposition on calendar forthwith." When Watchtower counsel responded that the document production was asking for the "Impossible," the court replied: "I understand that it's going to be quite an endeavor, but it also has been a very long time that this has been in the making. And one of the things I recall talking about the last time was that 90 days had already passed at the request of the documents, and we're looking at several more months, and it was represented to me that nothing had been done to even start the process. [¶] So I can't tell you how long it's going to take, *but it should have at least been attempted*, and it wasn't the last time I made the order." (Italics added.)

The next month, in March 2014, Lopez's counsel moved for an order scheduling the depositions and ordering the documents to be produced, noting that Watchtower was refusing to cooperate with the court orders. At the hearing, Watchtower's counsel said

18

Lösch's own counsel was present and "we have no ability to compel Mr. Losch to attend [his deposition].  That's the reality of our situation."  The court stated it had previously determined (at the January 2 hearing) that Lösch was Watchtower's "managing agent" and declined to rule on a motion to quash the deposition filed by Lösch's personal counsel.

The court and counsel then engaged in a lengthy colloquy pertaining to the documents ordered to be produced.  During this discussion, Watchtower's counsel restated his strong objections to the order, repeating his position that the order requires Watchtower to search through 14,000 congregation files and that Watchtower was unable to do so.  The court said it had made clear Watchtower should begin locating responsive documents and asked whether this process had commenced, but Watchtower's counsel was unable to identify a single person working on the document production.  Lopez's counsel responded that he had "grave concern[s]" about going ahead with the PMQ deposition without any assurance the documents would be produced.  He argued, "this whole idea that they cannot produce these documents is disingenuous at best . . . ," noting that Watchtower requests sexual abuse information from local congregations and "keep[s] track" of these individuals, and therefore it is not credible to conclude "they just shove [these documents] away somewhere . . . [and] don't have a database . . . ."  Watchtower's counsel replied:  "[T]here's just a certain unfairness about what the court has ordered my client to do.  It is a religion with almost 14,000 congregations nationwide.  This request asks them to produce documents that were transmitted and filed manually

19

into these 14,000 files involving these congregations. We explained in detail the manual search that would have to take place."

At the conclusion of the hearing, the court asked whether Watchtower intended to appear at the New York deposition with documents, and Watchtower's counsel said he believed the court abused its discretion in compelling Watchtower to produce these documents. The court responded there was nothing it could do at this point, "[b]ut if you show up for a deposition and documents aren't produced, and they were inappropriately not produced, I'll be looking at other motions."

After the hearing, the court issued an order setting the dates for the New York depositions of Watchtower's PMQ and stating "[t]he topics of the testimony are those previously noticed by Plaintiff" and "[a]t or before the commencement of the deposition, Watchtower must produce all documents requested by Plaintiff . . . ." The court also ordered Lösch's deposition to be taken on specific dates at a New York location to be mutually agreed by the parties.

Two weeks later, Watchtower and Lösch each filed a petition for a writ of mandate challenging the court's January 2 order. Several days later, on March 27, 2014, this court summarily denied both petitions, and the California Supreme Court later denied similar petitions.

The next week, on March 31 and April 1, Watchtower's PMQ (Ashe and Watchtower attorney Mario Moreno) appeared and testified at their New York depositions, but did not produce the documents at issue here. During his deposition, Ashe testified about Watchtower prior publications that discuss the problem of child

abuse and the significant long-term emotional and psychological damage to victims, and the requirement that any known abuse be reported to Watchtower. Ashe also testified that all Jehovah's Witnesses congregation files have been fully scanned into a computer system, including child abuse reports that are "marked do not destroy" and "stay[ ] indefinitely in [the] congregation file." He said there are 36 elders in Watchtower's Service Department available to search the files, but their primary job is to give spiritual guidance to congregation members and elders. Ashe said compliance with the January 2 order "would effectively shut down their duties in the Service Department for a considerable length of the time." When asked why these documents could not be located by an electronic search method, Ashe testified in part:

> "[The electronic system] was never designed for the 3,000,000 documents that we scanned into it at its managing force. So to put in the words, technical terms used by computer support, sometimes it's loopy. It's not reliable all the time but to try and type in a search parameter, we examine this. How can we do this to be in compliance. There is no easy way to do that. You have to search every congregation file electronically to try and do that. And the search parameters, for example if you type in child abuse, you're going to get every document that has the word child in it and every document that has the word abuse in it."

Ashe also said that when the computer identifies a responsive document, there is usually a brief delay ("a second delay") as the document uploads, and the document then would have to be reviewed for attorney/client privilege and therefore "It gets very complicated." He opined that "technically" Watchtower could not comply with the January 2 order using the electronic search method, and that "It would take years to get that information put together." Ashe also said "there are no [remaining] physical file[s]. Once they were

21

scanned[,] all those documents were destroyed." When asked why Jehovah's Witnesses could not devise a search for the phrase " 'do not destroy,' " Ashe responded that you "can try to do" this search, "but you'll come up with child abuse, you'll come up with adultery, you'll come up with bigamist marriage, you'll come up with slander, fraud, murder any abhorrent sin."

Lösch did not appear for his scheduled deposition.

### E. *Motion for Monetary and Terminating Sanctions*

One week after the depositions, on April 8, Lopez moved for terminating and monetary sanctions for Watchtower's failure to comply with the court's orders to produce the documents at the PMQ deposition and to produce Lösch for deposition. Regarding the PMQ deposition, Lopez's counsel stated that the deponents (Ashe and Moreno) did not produce documents responsive to Lopez's document request numbers 5 and 12.[5] Lopez's counsel also discussed the recent PMQ depositions, and noted that Ashe "testified that all of the historical records regarding child abuse that were [requested] by Plaintiff and ordered produced have been scanned into a computer system, and that the text of those scanned documents is searchable," but that Watchtower had made no efforts to "create[ ] a team to search for them. . . ." Lopez additionally discussed Watchtower's assertion of various meritless objections to earlier discovery. Lopez requested monetary sanctions of $37,799.21, primarily for his counsel's costs in attending Lösch's New York deposition and making a record of his nonappearance.

---

5    Although counsel's declaration identified "request for production numbers 4 and 12," based on other portions of Lopez's moving papers, it appears that counsel intended to identify request numbers 5 and 12.

In opposition, Watchtower reasserted its challenges to the discovery orders and alternatively argued there were insufficient grounds for terminating sanctions. Watchtower argued terminating sanctions were not appropriate because there was no evidence it destroyed or concealed documents, and instead it "simply cannot identify all the documents requested and produce the unprivileged documents with a privilege log in the limited time set by this court . . . ." Watchtower also argued it had no ability to compel Lösch's attendance and thus should not be sanctioned for his nonappearance. Watchtower additionally asserted that a terminating sanction would be an improper drastic remedy because Lopez would be unable to prove his claims and therefore a terminating order would place him in a better position than if defendants had complied with the court's orders. Watchtower also challenged the monetary sanctions request related to Lösch's deposition notice.

In reply, Lopez produced a declaration of a computer expert (Rafiq Wayani), who was consulted after Lopez's counsel learned of the scanned files on Watchtower's computer system. Wayani opined there were methods to extract the relevant data, and that this extraction "could take as little as two days to as long as two months," depending on the particular system.

F. *Court's Sanctions Order*

After conducting a hearing and considering the papers, the court granted Lopez's sanctions motion, stating that at the January 2 hearing, it "considered the recommendations of the discovery referee, as well as Watchtower's objections thereto, and adopted the recommendations as the order of the court," and Watchtower had

23

willfully and repeatedly refused to comply with the court's order.  In its written statement of decision, the court summarized its reasoning as follows:

>"The only facts prerequisite to imposition of a discovery sanction are the party's failure to comply with ordered discovery, and the failure was willful. . . .  This Court finds that [Watchtower] failed to comply with this court's orders requiring [it] to produce Mr. Losch for deposition, and to produce the documents requested by Plaintiff in connection with the PMQ Notice.  This Court further finds that Watchtower's refusal to comply with this Court's orders was willful. . . .

>"In opposing the motion, Watchtower made various arguments including that Mr. Losch was not Watchtower's managing agent. . . . [T]his Court has found to the contrary and has ordered his deposition to proceed.

>"[Watchtower] also contends that it was not required to comply with this Court's orders because it is exercising its appellate rights to challenge the validity of the underlying court orders . . . .  The Court agrees that Watchtower is within its rights to seek appellate review. However, in the absence of a stay . . . , compliance . . . is required notwithstanding any pending writ petition or petition for review. . . .

>"At the hearing of this motion, Watchtower devoted substantial time expressing its disagreement with the underlying orders of this Court requiring the deposition of Mr. Losch, and the production of documents relating to childhood sexual abuse complaints.  However, the validity of these orders is not at issue in the present motion.  The issue raised by Plaintiff's motion involve Watchtower's non-compliance with this Court's orders.  This Court's discovery orders are valid and remain in effect, and whether [Watchtower] agrees with the orders is inconsequential.  Watchtower was ordered to provide discovery and did not do so.

>"In its sur-reply, [Watchtower]—citing to [Ashe's] declaration—states that to produce the documents sought would be so time-consuming as to take years to search the relevant records.  However, the Court was unable to locate any evidence that Watchtower had at anytime since the Court first ordered production months ago has even attempted to locate responsive documents.  Even at the hearing of this motion, Watchtower did not provide any assurances that the

24

documents were in the process of being gathered, or that any effort had been made to comply with this Court's orders.

[¶] . . . [¶]

"The Court considered ordering the imposition of either issue sanctions or evidence sanctions in lieu of the terminating sanctions requested by Plaintiff. However, Plaintiff has made a showing that the materials requested are relevant to nearly [every] aspect of Plaintiff's claim[s], including his negligence based causes of action, ratification based cause of action, and his prayer for punitive damages, as well as to Defendants' claimed statute of limitations defenses. Given Watchtower's willful refusal to comply with multiple orders of this Court, and the fact that Watchtower produced no evidence of any attempt to comply with this Court's orders, this Court finds that only terminating sanctions can effectively respond to Watchtower's willful refusals.

"The Court additionally grants Plaintiff's request for monetary sanctions in the amount of $37,799.21 for the reasons argued in Plaintiff's papers, including the expenses associated with traveling to New York relative to the scheduled Losch deposition."[6]

Based on the terminating sanction order, the court entered Watchtower's default and scheduled a default prove-up hearing.

## DISCUSSION

### I. *Validity of January 2 Discovery Order*

As its primary challenge to the terminating sanction and entry of default, Watchtower contends the January 2 order is invalid and therefore its violations of the

---

[6]     We reject Watchtower's argument that we must disregard this written statement because it came after the court's oral ruling and/or because it did not comply with California Rules of Court, rule 3.1590. As Watchtower admits, rule 3.1590 "do[es] not apply to law and motion matters such as this one." Additionally, Watchtower does not cite, nor are we aware of, any authority prohibiting a court from explaining the grounds for an oral ruling after the ruling is made. A court may explain its ruling in writing, and the fact Lopez's counsel prepared a draft of the order is immaterial given the court's signature on the order.

order cannot be the basis for a discovery sanction. Watchtower contends the court erred in ordering the Lösch deposition and the PMQ document production. Watchtower also contends the January 2 order is void because the court did not independently consider Watchtower's objections to the Referee Recommendation.

As explained below, we conclude the court properly considered Watchtower's challenges to the Referee Recommendation and did not abuse its discretion in ordering the PMQ documents to be produced. But we determine the court order requiring Watchtower to produce Lösch for a deposition was invalid because the record does not contain sufficient evidence showing Lösch was Watchtower's "officer, director, managing agent, or employee." (§ 2025.280, subds. (a), (b).)

A. *Court Independently Reviewed Objections to Referee Recommendation*

Watchtower initially contends the January 2 order is invalid because the court did not comply with its statutory obligation to independently consider its objections to the Referee Recommendation. (§§ 643, 644.) The record does not support this argument.

A court may direct a special reference to a discovery referee to resolve the parties' discovery disputes. (§ 639.) If the trial court orders the reference without the parties' consent, "[t]he referee's factual findings are advisory recommendations only; they are not binding unless the trial court adopts them." (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 177 (*Petropoulos*); § 644. subd. (b).) In determining whether to adopt the findings, the court must "independently consider[ ] the referee's findings and any objections and responses thereto filed with the court." (§ 644, subd. (b); *Marathon Nat. Bank v. Superior Court* (1993) 19 Cal.App.4th 1256, 1261 (*Marathon*).)

26

The court has broad discretion to determine the best method for considering a party's challenges to the referee's findings, and the court is not required to hold a hearing or conduct a de novo analysis of the underlying arguments. (See § 644, subd. (b); *Marathon, supra*, 19 Cal.App.4th at p. 1261.) In its review, the court should give the referee's findings " 'great weight' " and focus on the parties' objections to those findings. (*Petropoulos, supra*, 91 Cal.App.4th at p. 176.) We examine the trial court's decision to accept the referee's recommendation for an abuse of discretion. (See *Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 226.)

The court held a hearing on the Referee Recommendation. At the outset, the court acknowledged its independent obligation to consider and rule on Watchtower's objections to the Referee's conclusions. The court initially expressed concern about the ex parte nature of the hearing, but after recognizing the approaching trial date and that the parties had fully briefed the issues, the court moved the hearing to the end of the calendar and then provided the parties a full opportunity to argue their respective positions. Although it appears the court did not read the Referee Recommendation or Watchtower's opposition memorandum before the hearing, the record affirmatively supports that during the hearing the court reviewed these documents, considered the newly submitted declarations, and carefully listened to Watchtower's counsel's oral explanation of the objections.

Watchtower contends it was not possible for the court to read "195 pages of written objections" during the hearing. The 195-page number is misleading. Watchtower's substantive objections to the Referee Recommendation were contained in

27

less than eight pages. The remaining pages included Lopez's affirmative discovery requests, Watchtower's initial objections to the document requests (spanning about 55 pages of substantially identical, boilerplate objections), and the parties' briefs submitted to the Referee. At the time of the hearing, the court was highly familiar with the issues and the parties. It had presided over the case for almost two years, had ruled on similar objections to earlier discovery requests, and had denied two summary judgment motions. We are satisfied the trial judge had the ability to, and did, review the objections and other relevant submissions during the hearing.

At the subsequent hearings in February, March and May 2014, the court stated it recalled reviewing and considering Watchtower's objections and that it had independently found them to be without merit. Absent a contrary indication on the record, we are required to accept the court's statements and presume the court complied with its statutory duties. (See *People v. Risenhoover* (1968) 70 Cal.2d 39, 56-57 [presumption the trial court does what it is supposed to do and reversal is inappropriate unless the record affirmatively shows the trial court misconstrued its powers].)

Watchtower's reliance on *Rockwell International Corp. v. Superior Court* (1994) 26 Cal.App.4th 1255 is misplaced. The *Rockwell* court found "the trial court abdicated its judicial responsibility by simply entering an order on the referee's report as though it were a binding decision of the court itself." (*Id.* at p. 1270.) Here, the court made clear that it understood the report was not binding, and that it was required to consider Watchtower's objections. Additionally, to the extent the *Rockwell* court suggested that in every case a trial court must consider the transcript of the referee hearing and the parties'

28

initial objections to the discovery, we disagree with this blanket rule. The statute requires only that the trial court independently consider the referee's findings and any objections and responses to these findings. (§ 644, subd. (b).) Although a court's review of the referee hearing transcript and/or the initial discovery objections may be helpful under certain circumstances, the rules do not mandate this in every case.

Having concluded the court complied with its statutory duties, we now turn to Lopez's contentions that the court abused its discretion in adopting the Referee's conclusions regarding the PMQ document requests and Lösch's deposition.

### B. *Document Production*

Watchtower contends the court erred in ordering the PMQ requested documents produced because: (1) the document requests did not seek relevant information and were "overly broad"; (2) the requests imposed an undue burden; (3) the order required the production of documents protected by the attorney-client and penitential-communication privileges; (4) the order violated third-party privacy rights; and (5) the order violated Watchtower's First Amendment rights. For the reasons explained below, we find each of these arguments to be without merit.

### 1. *Relevance/Overbreadth Arguments*

California law provides parties with expansive discovery rights. Section 2017.010 states: "[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence *or appears reasonably calculated to lead to the discovery of admissible evidence*." (Italics

29

added; see *Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 712, fn. 8.) The statutory phrase " 'subject matter' " is " 'broader than the issues' and is not limited to admissible evidence." (*Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 711; accord, *Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 172-173.) " 'For discovery purposes, information is relevant if it "might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement. . . ." [Citation.] Admissibility is not the test and information unless privileged, is discoverable if it might reasonably lead to admissible evidence. [Citation.] These rules are applied liberally in favor of discovery [citation], and (contrary to popular belief), fishing expeditions are permissible in some cases.' " (*Garamendi, supra*, 116 Cal.App.4th at p. 712, fn. 8.)

Lopez brought several claims against Watchtower, including negligent hiring, supervising, and retaining Campos, and failure to warn. To prevail on his negligent hiring/retention claim, Lopez will be required to prove Campos was Watchtower's agent and Watchtower knew or had reason to believe Campos was likely to engage in sexual abuse. (*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 836, 842-843 (*Evan F.*); see *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139-1140; *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 395-397.) On the negligent supervision and failure to warn claims, Lopez will be required to show Watchtower knew or should have known of Campos's alleged misconduct and did not act in a reasonable manner when it allegedly recommended him to serve as Lopez's Bible instructor. (See *Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, 1216; *Juarez, supra*, at pp. 395-397.) For each claim, Lopez will also be required to prove the alleged

sexual abuse occurred, causation, and compensatory damages. (See *Evan F., supra*, at p. 834.) Lopez sought punitive damages, which requires a showing of fraud, oppression, or malice. (Civ. Code, § 3294.)

Lopez's requests at issue on appeal identified documents concerning reports of child sexual abuse by members of the Jehovah's Witnesses from 1979 to the present, and documents prepared in response to a 1997 letter asking for information about known child abusers in Jehovah's Witnesses congregations. Watchtower argues the postabuse (post-1986) documents are not relevant to his claims because "they will *not* demonstrate what Watchtower knew *before* Lopez was abused (notice), what Watchtower did with information about Campos (negligence), or what an officer, director or managing agent of Watchtower did to express approval or censure Campos's conduct (ratification)."

Watchtower is viewing Lopez's discovery rights too narrowly. Although the documents may not contain information specific to Watchtower's preincident knowledge of Campos's dangerousness or its alleged ratification of Campos's conduct, the court had a valid basis to find the documents were relevant or potentially relevant to other matters at issue in the case.

First, the postincident documents were potentially relevant to Lopez's punitive damages claim, including the reprehensibility of Watchtower's actions. "The degree of reprehensibility of the defendant's conduct is the most important indicator of the reasonableness of a punitive damage award" (*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 985), and one relevant factor in this analysis is the extent to which the defendant's alleged wrongful conduct involved repeated actions, including conduct

31

occurring after the incident in question (see *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419; *Izell, supra*, at pp. 985-986). Although punitive damages may not be used to punish a defendant for injury inflicted on third parties, a jury may consider evidence of harm to others in determining the reprehensibility of a defendant's conduct toward the plaintiff. (*Philip Morris USA v. Williams* (2007) 549 U.S. 346, 355; *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1202-1204; *Izell, supra*, at p. 986, fn. 10; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1691; see CACI No. 3943.) By placing the defendant's wrongful conduct into the context of a continuing pattern and practice, "an individual plaintiff can demonstrate that the conduct toward him or her was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature." (*Johnson, supra*, 35 Cal.4th at p. 1206, fn. 6; *Izell, supra*, 231 Cal.App.4th at p. 987, fn. 10.) Accordingly, if the postabuse documents contain information that Watchtower continued to engage in similar conduct, this information could support Lopez's punitive damages claim (if the case reaches that stage).

The postabuse evidence may also be relevant on the issue whether Watchtower acted with the willful and conscious disregard for Lopez's rights. If the documents show Watchtower's agents continued to commit acts of child abuse and that Watchtower did not change its policies and/or took no meaningful protective actions, this evidence may be probative on the issue whether Watchtower was deliberately indifferent to Lopez's rights in 1986. Failure to prevent similar incidents may tend to prove the earlier acceptance of the abuse and thus willful and conscious disregard of Lopez's rights. (See

32

*Henry v. County of Shasta* (9th Cir. 1997) 132 F.3d 512, 519-520; *Grandstaff v. Borger* (5th Cir. 1985) 767 F.2d 161, 170.)

A similar principle applies on liability issues. The postabuse documents may contain information showing the nature of Watchtower's actions towards others accused of child abuse and this evidence could potentially shed light on Watchtower's actions or nonactions towards Campos and the intent underlying those actions. An entity's actions and the intent with which the party engaged in such actions "may be inferred from evidence of [its] subsequent conduct," including that the conduct was not merely a mistake or an accident. (*Tranchina v. Arcinas* (1947) 78 Cal.App.2d 522, 524; see *Foley v. Lowell* (1st Cir. 1991) 948 F.2d 10, 14; see also *In re Roman Catholic Archbishop of Portland* (Bankr. D.Or. 2005) 335 B.R. 815, 823 ["Although the relevant time frame for these [clergy sexual abuse] claims is the time of the alleged misconduct, evidence of [the Roman Catholic Archbishop's] later policies could possibly lead to evidence that would be relevant to the claims of negligence . . . ."].) The postincident evidence may also be relevant to test the validity of Watchtower's defenses regarding its knowledge of child sexual abuse at the time of the incident and the effectiveness of its claimed steps to protect Jehovah's Witnesses children in the 1980's.

In responding to these asserted relevancy grounds, Watchtower argues "Campos was not a cleric, agent, or employee of Watchtower" and therefore its postincident actions towards other clerics, agents, or employees had no connection to the claims at issue. This argument lacks merit at this stage of the litigation. The parties have stipulated the congregation elders were Watchtower's agents, and Lopez alleged that before the alleged

33

molestation occurred, congregation elders knew Campos had molested another child, yet represented to its members that Campos was a qualified Jehovah's Witnesses Bible instructor and was "very good with children." Lopez also alleged the elders knew Campos had molested multiple children and despite this knowledge later elevated Campos to the position of elder, an action Watchtower sanctioned. Given these allegations, Watchtower's assertions that Campos was merely a "rank-and-file congregation member" who perpetrated the alleged abuse unrelated to the Jehovah's Witnesses congregation may be a successful defense (if proven), but it is not a basis for precluding discovery.

Moreover, contrary to Watchtower's assertions, the fact that the other molestation incidents may have been different from the one that allegedly occurred here does not mean the other-perpetrator evidence was not discoverable. While the trial court will have to assess whether the information revealed in the documents is admissible (taking into account similarity, remoteness, prejudice, etc.), these issues are not dispositive at the discovery stage. A document may be discoverable even if it is unlikely to be admitted at trial. (See *Davies v. Superior Court* (1984) 36 Cal.3d 291, 301; *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1490-1491; *Norton v. Superior Court* (1994) 24 Cal.App.4th 1750, 1761.)

Watchtower contends that even assuming the relevancy of the postabuse documents, the document requests were patently overbroad given that they seek documents prepared more than 25 years after the alleged abuse. But on the issues for which the sexual abuse reports may be relevant, the court had a reasonable basis to

34

conclude reports prepared long after the incident could contain information helpful to Lopez's case, even if the document's remoteness to the incident may preclude its admission at trial. Moreover, Watchtower never proposed any time limits it considered reasonable. Viewing the totality of the circumstances (including the documents' conceivable significance on both liability and punitive damage issues, and the court's rejection of Watchtower's burdensome claims, discussed below), the court's determination was not an abuse of discretion.

In reaching this conclusion, we recognize that a 27-year postincident time period for requested documents is unusual. But the breadth of the request is partly a function of the permissive limitations statutes governing child sexual abuse, under which Lopez was seeking to recover for an alleged wrongful act committed almost three decades earlier.[7] Absent this tolling period or an equivalent circumstance, it is unlikely that a similarly time-expansive document production would be upheld.

### 2. *Claimed Burden of Document Production Request*

Watchtower additionally contends that even if the requested documents were discoverable under the liberal discovery-relevancy standards, the court erred in ordering it to produce the documents because the burden of responding to the requests was oppressive and substantially outweighed any possible relevance or informational value of the evidence. In support, Watchtower argues the evidence was "*uncontroverted*" that "the

---

[7]     Whether the lawsuit was timely and/or whether Lopez's claims are supported by the facts is not before us.

35

labor involved in locating and producing the virtually unlimited records Lopez requested will require literally tens of thousands of man hours."  (Italics added.)

Assuming Watchtower did not waive the argument by failing to raise it with the Referee, the court's rejection of this contention was fully supported by the record. Contrary to Watchtower's assertions, the evidence regarding the administrative burden was not "uncontroverted."  Lopez presented evidence countering Watchtower's claim that compliance with the Referee Recommendation would require years of "manually" looking through its files.  This included evidence showing Watchtower directed the elders to send to Watchtower reports about all known child abuse perpetrators in their respective congregations and gave specific instructions on the manner in which this information should be reported, including to segregate the reports and place them in " 'Special Blue' envelopes" that were to be kept indefinitely.  From this, the court had a reasonable basis to conclude the requested documents had been segregated within the congregational files and thus decline to credit Watchtower's claim it would take "years" to locate the responsive documents.

The court's rejection of the burden argument was also supported by Watchtower's conduct in refusing to take *any*—however minimal—steps to locate the responsive documents or to offer any suggestions on how to reasonably narrow the request.  At every hearing from January through April 2014, the court repeated its concern that although these documents had been first requested in October 2013, Watchtower had not made any effort to identify any responsive documents.  Watchtower's PMQ later admitted it was possible to quickly locate responsive documents if Watchtower knew the identity of a

36

sexual abuse perpetrator. Watchtower acknowledged it was aware of at least seven other child sexual abuse perpetrators, but it did nothing to locate documents pertaining to these individuals.

The court's finding was also supported by evidence showing Watchtower had scanned all documents from congregation files into a computer program that had a search function. Although one elder (Ashe) opined the search function would not accurately identify the other-perpetrator child abuse reports, Lopez's expert reached a contrary conclusion and there is no suggestion Watchtower made any efforts to design a search or consult with an individual qualified to conduct a search.

*Calcor Space Facility v. Superior Court* (1997) 53 Cal.App.4th 216, relied on by Watchtower, does not support its arguments. *Calcor* involved a document request against a *nonparty* that contained six pages of highly complex definitions and instructions and did not provide reasonable specification of the documents sought. (*Id.* at pp. 219-221.) In reversing an order compelling the documents, *Calcor* found the documents would have no evidentiary value in the litigation and urged trial courts to use their authority to prevent discovery abuse. (*Id.* at pp. 218-221.)

This case is different. It involves a request against *a party* for specifically described documents that have potential relevance to the subject matter of the lawsuit or may lead to the discovery of relevant evidence. Watchtower has superior knowledge regarding its files and documents, and the evidence showed the documents could be identified. We are satisfied the trial court recognized the broad scope of the document requests, but reasonably found Lopez's counsel sought the documents in good faith to

37

obtain necessary and helpful information to prepare the case. Whether this court would have reached the same conclusion as the trial court is not the issue. Instead, it is whether the court acted in an arbitrary and capricious manner in ordering Watchtower to produce documents responsive to the requests. Under the trial court's expansive authority over discovery issues, we find the court's rulings were reasonable.

### 3. *Claimed Privileges*

Watchtower also contends the order was invalid because it violated attorney-client and penitential-communication privileges.

This contention is unavailing because Watchtower misconstrues the scope of the order. We accept that certain requested documents could contain privileged material upon which the court would have to rule in due course. But contrary to Watchtower's assertions, neither the Referee nor the court ordered the production of privileged material. Instead, the Referee specifically ruled that Watchtower may prepare a privilege log for later review. This ruling was incorporated into the court's January 2 order, which adopted the Referee Recommendation in full. Because responsive documents had not yet been identified, neither the Referee, nor the trial court, was in a position to rule on any specific privilege claims.

Generally, "the privilege-claimant 'has the *initial burden* of proving the *preliminary facts* to show the privilege applies.' " (*Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 442 (*Roman Catholic Archbishop*).) Once the claimant establishes the preliminary facts, it is presumed that the matter sought to be disclosed was a communication made in confidence in the course of

38

the lawyer-client or clergy-penitent relationship. (Evid. Code, § 917.) At that point, the burden of proof shifts to the party opposing the privilege claim. (*Roman Catholic Archbishop, supra*, at p. 442.)

Because Watchtower had not yet produced a privilege log or identified any specific confidential communications, it had not met its burden to show the preliminary facts supporting the application of the privilege. Thus, its privilege claim was premature. For example, as the court ruled earlier in this case, to the extent that the reports were written and sent to Watchtower with the expectation they would be read by a third party, they do not come within the penitential-communication privilege. (See *Roman Catholic Archbishop, supra*, 131 Cal.App.4th at pp. 444-445; see also *Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1229-1230 (*Conti*).)

Watchtower argues "the very categories and broad descriptions of information and documents demanded by Lopez *necessarily* sought documents protected by the attorney-client and clergy-penitent privileges . . . ." (Italics added.) The record does not support this argument. In the challenged document requests, Lopez primarily sought reports prepared by elders in response to Watchtower's requests for the information. There is no indication that these reports necessarily arose from an attorney-client or a clergy-penitent communication and/or were prepared in the context of litigation.

Watchtower's reliance on *Conti, supra*, 235 Cal.App.4th 1214, is misplaced. Watchtower relies on the portion of *Conti* in which the Court of Appeal declined to impose a duty on a clergy member to notify congregation members of a penitential communication (e.g., a church member's private confession to a clergyperson) involving

39

suspected child abuse. (*Id.* at p. 1230.) We agree with this principle, but it does not help Watchtower on the issue of *whether* it met its preliminary burden to show an applicable privilege. The *Conti* court recognized the fundamental importance of the penitential communication privilege, but also found this privilege did not apply to communications if they were shared with others or made with the expectation they would be disclosed beyond the protected relationship. (*Id*. at pp. 1229-1230.) This principle applies equally in this case and underscores the need for Watchtower to have provided a privilege log to support any privilege claim.

In asserting error on the privilege issue, Watchtower focuses on the Referee's statement that it would review the claimed privileged documents "*in camera*." Watchtower correctly argues that privileged communications are generally not subject to in camera review. (See *Costco Wholesale Corp. v. Superior Court* (2010) 47 Cal.4th 725, 736-737.) But there are two fundamental flaws with Watchtower's contention for purposes of our appellate review. First, there is no showing on this record that Watchtower raised this in camera issue below. Thus, it is waived. (See *Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 155.) More important, this contention is unrelated to the court's sanctions order. The court did not sanction Watchtower because it refused to provide the privileged documents for an in camera review. Instead, the court imposed a sanction for Watchtower's willfully violating the court's order to search for, identify, and produce nonprivileged documents (and/or at least *start* this process), and prepare a privilege log for any responsive privileged documents. It is undisputed that Watchtower failed to do this. To the extent Watchtower is arguing

that it did not make any effort to comply with the court's order because it was concerned with the Referee's summary reference to an in camera hearing, we find this argument unconvincing.

## 4. *Third-Party Privacy Rights*

Watchtower contends the court's January 2 order was also invalid because it would violate the privacy rights of others, and the court "failed to adequately take the rights of those third parties into consideration . . . ." The Referee and the trial court rejected these arguments because the order specifically permitted Watchtower to redact names, birthdates, and Social Security numbers from the documents.

Watchtower argues the redaction would not prevent the violation of privacy rights "where the circumstances surrounding such reports would nonetheless make them readily identifiable to anyone with a modicum of familiarity with those individuals." This argument is unsupported by the record. There were no facts before the Referee or the trial court showing the documents would disclose the identities of the individuals after deleting personal identifying information. To the extent Watchtower believes that a particular document would fall within this category, it had the right to seek some form of protection. But the record does not support a blanket objection based on third-party privacy rights given the order's express redaction provision.

We find unavailing Watchtower's additional argument that the documents relating to other child abuse perpetrators were sought solely to assist Lopez's counsel in soliciting additional clients. The Referee and the court rejected this argument, and they had a

41

reasonable basis to do so.  There is no basis in the appellate record showing the court abused its discretion in finding the discovery was sought for proper purposes.

### 5.  *First Amendment Objection*

Watchtower next argues the January 2 order was improper because it violated its First Amendment religious freedom rights.  In support, Watchtower contends that issues of ratification and agency are "inquiries which necessarily require the court to entangle itself in the interpretation, evaluation and determination of the religious beliefs and internal governance of Jehovah's Witnesses."  This argument is not a basis for limiting discovery at this stage of the litigation.  The court's January 2 order did not reflect the court's ruling that Lopez's ratification or agency theories are legally valid or that the court or jury will be permitted to engage in factfinding that would interfere with religious doctrine.

In a related argument, Watchtower relies on a line of cases applying the ministerial-privilege doctrine, a constitutionally based rule that exempts religious organizations from liability arising from employment-related claims by a religious figure. (See *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC.* (2012) __ U.S. __ [132 S.Ct. 694, 706-707]; *Alcazar v. Corp. of Catholic Archbishop* (9th Cir. 2010) 598 F.3d 668, 672-673, affd. in part and vacated in part, 627 F.3d 1288; see also *Henry v. Red Hill Evangelical Lutheran Church of Tustin* (2011) 201 Cal.App.4th 1041, 1053.)  This doctrine " 'is based on the notion a church's appointment of its clergy, along with such closely related issues as clerical salaries, assignments, working conditions, and termination of employment, is an inherently religious function because clergy are such an

42

integral part of a church's functioning as a religious institution.' " (*Henry v. Red Hill, supra*, at p. 1053; *Roman Catholic Archbishop, supra*, 131 Cal.App.4th at p. 433.)

This rule is not applicable here. The ministerial exception applies to bar an action by a clergy member against a religious institution. (See *Roman Catholic Archbishop, supra*, 131 Cal.App.4th at p. 433.) Watchtower has not cited, nor are we aware of, any decisions extending this rule to preclude a third party action against a religious organization for the tortious conduct of its agents. And the law appears to be to the contrary. (See *Evan F., supra*, 8 Cal.App.4th at pp. 841-843 [Methodist pastor molesting minor]; *Stevens v. Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 884-887 [visiting French priest held agent of local diocese for purposes of holding the diocese liable for priest's negligence in vehicle accident].)

More than 10 years ago, a Court of Appeal rejected a similar First Amendment argument seeking to preclude the production of documents in a child sexual abuse case. (*Roman Catholic Archbishop, supra*, 131 Cal.App.4th at pp. 432-433.) There, the grand jury subpoenaed documents from the Archdiocese to determine whether to indict priests who allegedly sexually abused children while working for the Archdiocese. (*Id.* at p. 425.) In affirming orders compelling the document production, the court rejected arguments that the disclosure order violated constitutional religious freedom rights, and found the asserted "ecclesiastical abstention doctrine" and the "ministerial exception" rule were inapplicable to the case. (*Id.* at pp. 430-440.) The court also held "the disclosure of the subpoenaed documents . . . will not result in excessive entanglement or any other violation of the establishment clause." (*Id.* at p. 436.)

## C. *Lösch's Deposition*

Watchtower contends the court erred in ordering it to produce Lösch for deposition. The court's order was based on the court's adoption of the Referee's finding that Lösch is a "managing agent" under section 2025.280, subdivision (a), and thus service of the notice on Watchtower was sufficient to require Lösch's appearance. On the factual record before us, we determine Lopez did not satisfy his minimal burden to present evidence showing Lösch fell within the statutory "managing agent" category. (§ 2025.280, subd. (a).) Accordingly, the order compelling Watchtower to produce Lösch was invalid and the court did not have the authority to sanction Watchtower for its noncompliance with this order.

### 1. *Statutory Framework*

Generally, a party may require the deposition of a nonparty only if the party serves the deponent with a deposition subpoena. (§ 2025.280, subd. (b).) Thus, a deposition notice served on the opposing party is inadequate to compel a third party's attendance. (*Ibid*.) However, a subpoena is not required if the deponent is "an officer, director, managing agent, or employee of a party." (§ 2025.280, subd. (a).) The discovery statutes refer to this deponent as a "party-affiliated deponent." (§ 2025.450, subd. (h).) The requisite "party-affiliated" relationship must exist at the time of the deposition notice. (*Maldonado v. Superior Court* (2002) 94 Cal.App.4th 1390, 1398 (*Maldonado*).)

If a party-affiliated deponent fails to obey a court order to attend a deposition, the court may impose monetary, evidentiary, issue, or terminating sanctions against the party. (§§ 2025.450, subd. (h), 2025.480, subd. (k); see § 2023.030.) However, if the deponent

44

is not a party or a party-affiliated deponent, the court has no authority to impose sanctions on the party for the deponent's disobedience of the order. (See *ibid.*; § 2025.280, subd. (b); Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 8:824, p. 8E-144.) By creating this distinction, the Legislature necessarily recognized a party should not be sanctioned if it had no legal or practical means to require the nonparty deponent to attend his or her deposition.

## 2. *Definition of Managing Agent*

Both parties acknowledge that Lösch was not a party, nor was he an officer, director, or employee of Watchtower. However, Lopez argued Lösch was a party-affiliated deponent because he was a "managing agent" based on his status as a member of a Jehovah's Witnesses organization known as the "Governing Body." In support, Lopez presented evidence showing the Governing Body issues policy directives applicable to Watchtower and the local congregations. Although Watchtower argued below (and on appeal) that the Governing Body has solely a spiritual function within the Jehovah's Witnesses religion, Lopez's evidence showed that the Governing Body has broader administrative responsibilities, such as issuing policy guidelines regarding child abuse prevention and reporting in local congregations. The Referee, as a trier of fact, was entitled to find this evidence credible and reject Watchtower's contrary evidence. On its independent review, the court also had a reasonable basis to adopt this factual finding in its January 2 order.

But the fact the Governing Body had this policymaking function does not answer the question whether Lösch was Watchtower's "managing agent." The California

45

Supreme Court has defined a "managing agent" for purposes of the discovery statutes as "a person who may exercise his judgment and discretion in dealing with corporate matters, who can be expected to comply with [the party's] directive to appear for [the requested examination], and who can be anticipated to identify himself with the interests of the corporation." (*Waters v. Superior Court* (1962) 58 Cal.2d 885, 896 (*Waters*).) "The question whether a particular deponent is a 'managing agent' of one of the parties for purposes of pretrial discovery proceedings must of necessity be answered pragmatically" and is highly dependent on the particular factual circumstances before the court. (*Id.* at pp. 896-897; see *Roehl v. Texas Co.* (1930) 107 Cal.App. 691, 704.) In analyzing the issue, California courts look to federal court decisions that apply a similar "managing agent" test. (*Waters*, at pp. 895-896; see *Reed Paper Co. v. Proctor & Gamble Distributing Co.* (D.Me. 1992) 144 F.R.D. 2, 4.) Generally, it is the party seeking to compel the deposition that has the initial burden to show the foundational facts to support a "managing agent" finding. (See *Sugarhill Records, Ltd. v. Motown Record Corp.* (S.D.N.Y. 1985) 105 F.R.D. 166, 170.)

Before applying the *Waters* test, we note our agreement with Lopez that a "managing agent" need not be an employee. Given that the terms "employee," "officer," "director," and "managing agent" are each used in the statutory description of a party-affiliated deponent, and the statute uses these terms in the disjunctive (§ 2025.280, subd. (a)), we agree that a "managing agent" need not also be an employee, officer, or director. Otherwise, the use of the phrase "managing agent" would be surplusage. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 658 [" '[c]ourts should give meaning to every word of a

46

statute if possible, and should avoid a construction making any word [or phrase] surplusage' "].)  This conclusion is consistent with analysis by federal courts, which have recognized that a third party (such as an independent contractor or former officer) may be deemed a party's "managing agent" upon a factual showing that the deponent currently serves in that functional role.  (*United States v. Afram Lines, Ltd.* (1994) 159 F.R.D. 408, 413 (*Afram*); see *Founding Church of Scientology, Inc. v. Webster* (Fed. Cir. 1986) 802 F.2d 1448, 1451-1453; *Dubai Islamic Bank v. Citibank, N.A.* (S.D.N.Y. 2002) 2002 WL 1159699, p. *3; *U. S. Fidelity & Guar. Co. v. Braspetro Oil Services Co.* (S.D.N.Y. 2001) 2001 WL 43607, p. *3 (*Braspetro*); *Calgene, Inc. v. Enzo Biochem, Inc.* (E.D.Cal. 1993) 1993 WL 645999, p. *8.)  We also find Watchtower's reliance on decisions construing the "managing agent" phrase within the meaning of Civil Code section 3294, subdivision (b) not particularly helpful because the punitive damages and discovery statutes have different language, purposes, and objectives.

3. *Insufficient Evidence Showing Lösch Is a Managing Agent*

With these principles in mind, we turn to consider the three *Waters* factors:  (1) does the person exercise judgment and discretion in dealing with the party's matters; (2) can the person be expected to comply with the party's directive to appear; and (3) can the person be anticipated to identify himself or herself with the party's interests.  (*Waters, supra*, 58 Cal.2d at p. 896.)

Lopez's evidence satisfies the first and third factors.  Lopez presented Shuster's deposition testimony stating Lösch is a long-standing member of the Governing Body, which approves operational guidelines for the United States Branch of the Jehovah's

47

Witnesses organization, including issuing directives for preventing and investigating child sexual abuse within the church. Shuster also testified that the Governing Body "oversees" the worldwide activity of Jehovah's Witnesses.

Based on this testimony, the court could reasonably infer Lösch (as a Governing Body member) had the authority to, and did, exercise supervisorial authority and discretionary judgment over Watchtower's operations, including those potentially relevant to the issues in this case. Based on this same evidence, the court could have also reasonably found Lösch would likely identify with Watchtower's interests.

However, Lopez failed to produce any evidence on the second *Waters* factor: whether the proposed deponent can be expected to comply with the party's directive to appear. Although there was evidence indicating the Governing Body (and its members) asserted authority over Watchtower and could influence its conduct, there was no evidence showing the reverse was true. For example, Lopez proffered no facts to indicate that Lösch receives compensation or other tangible benefits from Watchtower or that Governing Body members had previously complied with such deposition directives. (See *Afram, supra*, 159 F.R.D. at p. 415 [deponent's "history of cooperating with a party in discovery may be probative of the party's ability to rely on the agent to testify"].) Likewise, there was no evidence concerning the Governing Body's status as a separate legal entity or as an affiliate of Watchtower. (See *Braspetro, supra*, 2001 WL 43607, *5 [fact that deponent is "completely separate entity from [party], without any contractual obligation to act on [party's] behalf" means "there is no reason to assume that [party] can assure participation in a deposition for an action to which [deponent] is not a party"].)

48

Without evidence from which a reasonable inference can be drawn that Watchtower had some legal or practical ability to influence Lösch's decision to attend the deposition, there is no basis to conclude Lösch could be expected to comply with Watchtower's directives to appear.

If the deponent is the party's employee, officer, or director, an entity has substantial practical control to compel the attendance of these individuals, including the ability to terminate an employee who refuses to appear at a noticed deposition or to end the relationship with its officer or director. (See *Twin Lock, Inc. v. Superior Court* (1959) 52 Cal.2d 754, 759 ["There can be no doubt that a witness . . . will be under considerable coercion to attend whenever his corporate employer is placed upon the severe sanctions authorized by section 2034."].) But if the deponent has no formal or legal role within the party's organization, there must be some additional factual basis to establish the party has the practical ability to require the nonparty's compliance. (See *Maldonado, supra*, 94 Cal.App.4th at p. 1398 [holding party was not required to produce a former employee even if "the former employees are far more knowledgeable about the litigation than anyone currently employed by the company"].)

Viewing the entire record and applying the required pragmatic analysis, there was insufficient evidence to support a determination that Lösch was Watchtower's "managing agent" for purposes of compelling his deposition and granting sanctions for his nonappearance. The discovery statutes must be construed to ensure fairness and that the ends of justice are served. Because a party may be subject to severe sanctions if a party-affiliate does not attend a deposition, there must be at least some minimal showing that

49

the party has the ability to induce the deponent to attend the scheduled deposition. A contrary conclusion would be unjust and inconsistent with the purposes of discovery procedures under California law—to avoid surprise, aid in ensuring all parties are in possession of relevant facts, and assure fairness to all parties.

### III. *Terminating Sanctions*

Watchtower also contends the court erred in issuing terminating sanctions. Because the court ordered the sanctions issued based on both discovery orders, and we are reversing one of those orders, the matter must be remanded to the trial court. But given that the issues may arise again on remand and for purposes of judicial efficiency, we shall rule on Watchtower's contention.

California discovery law authorizes a range of penalties for a party's refusal to obey a discovery order, including monetary sanctions, evidentiary sanctions, issue sanctions, and terminating sanctions. (§§ 2023.010, 2023.030; *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 390; *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991 (*Doppes*).) A court has broad discretion in selecting the appropriate penalty, and we must uphold the court's determination absent an abuse of discretion. (*Los Defensores, supra*, at p. 390.) We defer to the court's credibility decisions and draw all reasonable inferences in support of the court's ruling. (*Id.* at pp. 390-391.)

Despite this broad discretion, the courts have long recognized that the terminating sanction is a drastic penalty and should be used sparingly. (See *Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 613-616.) A trial court must be cautious when

50

imposing a terminating sanction because the sanction eliminates a party's fundamental right to a trial, thus implicating due process rights.  (See *Lyons v. Wickhorst* (1986) 42 Cal.3d 911, 916; *Newland*, *supra*, 40 Cal.App.4th at pp. 613-614.)  The trial court should select a sanction that is " ' "tailor[ed] . . . to the harm caused by the withheld discovery." ' "  (*Doppes, supra*, 174 Cal.App.4th at p. 992.)  " '[S]anctions "should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery." ' "  (*Ibid.*)

The discovery statutes thus "evince an incremental approach to discovery sanctions, *starting* with monetary sanctions and *ending* with the ultimate sanction of termination."  (*Doppes, supra*, 174 Cal.App.4th at p. 992, italics added.)  Although in extreme cases a court has the authority to order a terminating sanction as a first measure (see *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 928-929; *Alliance Bank v. Murray* (1984) 161 Cal.App.3d 1, 10), a terminating sanction should generally not be imposed until the court has attempted less severe alternatives and found them to be unsuccessful and/or the record clearly shows lesser sanctions would be ineffective (see *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1516; *Doppes, supra*, 174 Cal.App.4th at p. 992; *Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1399; *R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 496).

There is no question that Watchtower willfully failed to comply with the document production order.  In the January 2 written order, the court required Watchtower to produce the documents requested in Lopez's PMQ deposition notice, and the court repeated this order at several subsequent hearings, including with respect to the postabuse

51

reports. Watchtower made no effort to comply with the order, and instead continued to repeat its previously unsuccessful objections. The court rejected the credibility of Watchtower's assertions that it would need to physically inspect each congregation file and that this inspection would take many years to complete. The court instead credited the Watchtower PMQ's deposition testimony that all potentially responsive documents have been scanned into a computer system and Lopez's expert's opinion that this computer system has a search function that could assist in identifying the requested documents. The court also repeatedly emphasized Watchtower's failure to take *any* steps—however minimal—toward complying with the court's order.

On this record, the court had the authority to impose sanctions for Watchtower's willful disobedience of its order. But, as Lopez admits, the terminating sanctions order was the *first and only* sanction imposed (along with a monetary sanction for the Lösch deposition costs). And the court imposed the sanction within four months of its initial document production order.

The fundamental flaw with the court's approach is that there is no basis in the record showing the court could not have obtained Watchtower's compliance with lesser sanctions or that another sanction could not effectively remedy the discovery violation. To the contrary, the record supports that the court had numerous tools at its disposal to compel compliance before imposing the ultimate sanction. For example, the court could have imposed a significant monetary penalty for every day Watchtower did not search for the documents and/or for each day the responsive documents were not produced. Alternatively, the court could have imposed evidentiary or issue sanctions to replace the

52

information that would or could be included within those documents. When a party does not produce ordered documents, the court is entitled to infer the documents would contain evidence damaging to that party's case and instruct the jury accordingly. (See *Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 987-990.) Thus, as Watchtower now proposes "the trial court could have . . . ordered an issue sanction that would have precluded Watchtower from disputing certain aspects of liability at trial." Or—if the case proceeded to the punitive damage stage—the court could have considered instructing the jury that Watchtower refused to produce documents concerning subsequent child sexual abuse incidents, and from that the jury could infer Watchtower had engaged in a pattern and practice of ignoring and/or ratifying sexual abuse by its agents.

Although the court made a conclusory observation in its written order that it had considered imposing issue or evidentiary sanctions, the record does not contain any basis to find the court had made a meaningful effort to determine whether the alternatives would be effective. The court suggested only that a suitable alternate sanction could not be devised because the "materials requested are relevant to nearly [every] aspect of [Lopez's] claim[s]."

This finding is unsupported. Viewing the record at this stage of the litigation, it is unlikely the responsive information would relate to at least some of the core issues at trial, including whether Lopez was in fact a victim of the abuse, whether Castro was Watchtower's agent, whether Watchtower's statute of limitations defense applied in this case, and the existence and extent of Lopez's economic and/or emotional distress damages. Watchtower previously complied with the court's order to produce all

53

unprivileged documents pertaining to Castro and Watchtower's knowledge of his prior or subsequent misconduct, and these documents would have contained information on several of these core issues. Given that there were disputed issues unaffected by the document production and the court and parties made no meaningful effort to at least consider and discuss possible alternative sanctions, the court's conclusion that there was no effective alternate sanction is premature and unsupported.

We conclude the court erred in ordering terminating sanctions because there was no evidence that lesser sanctions would have failed to obtain Watchtower's compliance with the document production order and because there were other possible sanctions that could have effectively remedied the discovery violation. On remand, the court has broad discretion to start with a different sanction that does not wholly eliminate Watchtower's right to a trial.

DISPOSITION

We order the court to vacate:  (1) the portion of the January 2 order requiring Watchtower to produce Lösch for his deposition; (2) the order granting terminating and monetary sanctions; and (3) the entry of default and the default judgment.  Each party to bear its own costs.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.